Report of the Federal Examiner

In the Matter of

Creditron Financial Corporation

d.b.a.

Teletron Marketing Group, Inc.

Chapter 11

Case Number:     08-11289-TPA



# Schaffner
# Knight
# &Minnaugh
## Company, P.C.

CERTIFIED PUBLIC ACCOUNTANTS
www.skmco.com

1001 State Street, Suite 1300
Erie, Pennsylvania 16501
Phone: (814) 454-1997
Fax: (814) 454-1476

500 Pine Street, Suite 14
Jamestown, New York 14701
Phone: (716) 483-0071
Fax: (716) 483-0161

December 9, 2010

Honorable Thomas P. Agresti, Chief Judge
United States Bankruptcy Court
For the Western District of Pennsylvania
Room A-150
17 South Park Row
Erie, Pennsylvania 16501

**Re:**   **Creditron Financial Corporation**
            **d.b.a.**
            **Teletron Marketing Group, Inc.**
            **Chapter 11**
            **Case Number:  08-11289-TPA**

Dear Judge Agresti:

Pursuant to your orders enclosed herewith is my report as Federal Examiner with regard to the above-referenced case.

Respectfully submitted,

James A. Schaffner, CPA/ABV, CFF, CVA
Principal

An Independently Owned Member
**McGLADREY ALLIANCE** | McGladrey

The McGladrey Alliance is a premier affiliation of independent accounting and consulting firms. The McGladrey Alliance member firms maintain their name, autonomy and independence and are responsible for their own client fee arrangements, delivery of services and maintenance of client relationships. The McGladrey Alliance is a business of RSM McGladrey, Inc., a leading professional services firm providing tax and consulting services. McGladrey is the brand under which RSM McGladrey, Inc. and McGladrey & Pullen, LLP serve clients' business needs. McGladrey, the McGladrey logo and the McGladrey Alliance signatures are used under license by RSM McGladrey, Inc. and McGladrey & Pullen, LLP

**Report of the Federal Examiner**
**Creditron Financial Corporation**
**d.b.a.**
**Teletron Marketing Group, Inc.**

**Table of Contents**

Requirements of the Federal Examiner....................................................................................1

Company Background ..........................................................................................................1

Interviews of Parties Considered to Possess Pertinent Information ................................2

Documents Reviewed and Considered ...............................................................................2

Documents Requested..........................................................................................................3

Financial Analysis of the Debtor .......................................................................................3

The Salaries of the Covattos ..............................................................................................6

Litigation................................................................................................................................6

Failure to Pay Over Trust Fund Taxes and Responsible Parties.....................................7

The Potential Sale of the Company ....................................................................................8

Findings of the Examiner.....................................................................................................9

**Requirements of the Federal Examiner**

The duties of a Federal Examiner are set forth in the U.S. Code at Title 11, Subchapter 1, Section 1106. In the case of Creditron Financial Corporation, I am required to assess the following matters:

1) The financial results of the Debtor since its filing date of July 3, 2008.

2) The financial condition of the Debtor as of the date of this report.

3) The status of the trust fund taxes.

4) The continued viability of the Debtor under any written or to be proposed plan of reorganization.

5) The appointment of a Chapter 11 Trustee and impact on existing and new customer contracts.

6) Consideration of other relevant issues to be determined by me.

7) Submit a written recommendation to the Court for review and consideration.

**Company Background**

The Debtor was formed on July 18, 1985. It is organized as a corporation and has elected S status. The shareholders of the Debtor at all times from its formation through the current date have been Alfred D. Covatto and Joyce M. Covatto.

The business of the Debtor is that of a contact center specializing in inbound customer service. Its customer base consists of national entities, the identity of which is intentionally not disclosed

at this time. The Debtor currently employs 397 individuals and is located at 1545 West 38th Street, Erie, Pennsylvania, 16508. The Debtor leases its facilities from an entity owned by the Covattos known as Boardwalk Business Square of Erie.

On July 3, 2008, the Company voluntarily filed for Chapter 11 bankruptcy protection and has continuously remained in that status through the date of this report.

**Interviews of Parties Considered to Possess Pertinent Information**

During the course of my investigation, I interviewed individuals deemed to possess relevant knowledge of the Debtor. These interviews were conducted in person or via telephone.

Those individuals and their relationship to the Debtor are as follows:

Alfred D. Covatto, Officer and Shareholder

Joyce M. Covatto, Officer and Shareholder

Stephen H. Hutzelman, Esq., Corporate Attorney

Craig A. Markham, Esquire, Special Counsel

Nicholas R. Pagliari, Esquire, Representing Dollar Bank

**Documents Reviewed and Considered**

1) The monthly financial statements of the Debtor filed with the Court from July 31, 2008 through October 31, 2010.

2) Payment history of Dollar Bank indebtedness.

3) Draft purchase agreement of Veteran Call Center, LLC

**Documents Requested**

Due to time restraints, I was unable to review the following documents that the Debtor will provide:

1) The Federal Income Tax Returns of the Debtor for the years ended December 31, 2000 through December 31, 2009.

2) The financial statements of the Debtor prepared by independent certified public accountants.

3) The lease agreement between the Debtor and Boardwalk Business Square of Erie.

4) The Federal income tax returns of Boardwalk Business Square of Erie for the years ended December 31, 2000 through December 31, 2009.

5) The books and records of Boardwalk Business Square of Erie for the period January 1, 2008 through the present date.

I intend to review said documents subsequent to the Hearing.

**Financial Analysis of the Debtor**

I reviewed the Monthly Operating Reports submitted to the Court from the inception of the case (month ended July 31, 2008) through October 31, 2010. During the course of my review, I noted specific matters that require comment.

## COMPARISON OF REPORTED MONTHLY NET INCOME (LOSS), SALES, OFFICERS' SALARIES AND STAFF SALARIES

**At Tab 1** is a compilation of the Debtor's monthly financial results, sales, officers' salaries and staff salaries. You will note that the aggregate net loss for the period July 1, 2008 through October 31, 2010 amounted to **$187,000** (a twenty eight month period). Sales steadily declined during the period as did staff salaries. Officers' salaries, however, were at consistent levels throughout the period averaging approximately **$105,000** per month.

**Rents Paid to Related Party**

As I previously stated, the Debtor leases its business offices from an entity owned by the Covattos. The total rent paid from the filing date through October 31, 2010 amounted to **$1,045,000** of which **$477,000** was remitted to Dollar Bank and **$568,000** was deposited or wired into the Boardwalk account. **See Tab 2**. The amounts paid to Dollar Bank represent the repayment of monies borrowed by the Covattos, which are secured by the Boardwalk real estate and guaranteed by the Debtor. The deposits to the Boardwalk checking account were available for distribution to the Covattos. I have not determined at this time if the lease arrangement between the Debtor and Boardwalk is at fair market value. In order to assess the propriety of the transaction I will need to review the books and records of Boardwalk. This information has been requested and will be reviewed subsequent to the Hearing.

**The Balance Sheets of the Debtor**

The balance sheets of the Debtor mislead a statement reader. Included in current assets for each month from the date of filing is approximately **$4,900,000** labeled as intangible assets[1]. These amounts as set forth in the Monthly Operating Reports are presented at **Tab 3**. Mr. Covatto in the presence of Mrs. Covatto and their Counsel indicated to me that the intangible assets were recorded in either 2007 or 2008. The intangible assets purportedly represent an accumulation of corporate business acumen and brand as defined by Mr. Covatto at **Tab 4**. It is unknown to me how Mr. Covatto ascribed a **$4,900,000** value to what he states in **Tab 4,** but it is clear that there is no intangible asset of **$4,900,000** and the current assets in each of the Monthly Operating Reports were intentionally overstated. By recording a fictitious current asset of **$4,900,000**, the financial statement presentation gives the reader the false impression that the Debtor had maintained positive levels of working capital throughout the review period. It should be noted that Mr. Covatto signed the Monthly Operating Reports under penalty of perjury.

I recast the Debtor's monthly balance sheets to compare its quick assets[2] to certain of its current liabilities to assess the Debtor's financial condition throughout the period.

This comparison is set forth at **Tab 5**. The deficiency in working capital is consistent throughout the period ranging from a low of **$2,304,000 at November 30, 2008 to a high of $3,279,000 at October 31, 2010, which represents the Debtor's most recent deficiency reported to the Court.** What can be ascertained by this analysis is that the Debtor was able to continue in business solely because of the forebearance of its creditors and particularly the taxing authorities.

---

[1] Intangible assets are defined as intangible non-monetary assets that cannot be seen, touched or physically measured, which are created over time and that are identifiable as a separate asset.
[2] Quick assets is an accounting term defined as cash and other assets such as accounts receivable which can or will be converted into cash fairly soon.

A comparison of the Debtor's obligations owing to the taxing authorities at July 31, 2008 to that of October 31, 2010 indicates an additional **$157,000** of trust fund and employer payroll taxes are outstanding at October 31, 2010.

Please note that I relied on the accuracy of the financial data submitted by the Debtor that is contained in the Monthly Operating Reports. I did not perform any audit or attest services nor do I recommend that those services be performed at this time.

## THE SALARIES OF THE COVATTOS

Disclosed at **Tab 6** are the salaries of Joyce M. Covatto and members of the Covatto family that aggregate to **$423,000** for the period October 1, 2008 through September 30, 2010. A summary of the salaried Covatto family members follows:

| | |
|---|---|
| **Joyce M. Covatto** | **$36,000** |
| **Renee Covatto (daughter)** | **$53,248** |
| **Andrea Covatto (daughter)** | **$47,000** |
| **Thomas Laird (son)** | **$56,000** |

Alfred D. Covatto is not a salaried employee of the Debtor.

## LITIGATION

The Debtor engaged Craig A. Markham, Esq. of the firm of Elderkin, Martin, Kelly & Messina as Special Counsel to represent the Debtor in two related civil matters.

The first was an action filed against the Debtor by Delaware Marketing Partners (DMP) alleging non-payment of the Debtor's purchase of a series of lists of names and addresses to be used in the ordinary course of Debtor's business activities. The U.S. District Court granted summary judgment in favor of DMP, which was followed by a stipulation by the parties that the Debtor owed approximately **$2,647,000** to DMP. In March 2008, the Debtor filed Notice of Appeal.

The second lawsuit was filed by Creditron Financial Services, Inc. and Creditron Financial Corp. against K2 Financial, LLC (K2) alleging that K2 (formed by the principals of DMP) violated non-compete and confidentiality covenants in the contract between the Debtor and DMP. Since the Court entered summary judgment against the Debtor in the DMP matter, the Debtor's claim against K2 also was dismissed. In June 2008, the Debtor filed Notice of Appeal.

At this date, the Debtor is obligated to DMP in the amount of approximately **$2,647,000**. DMP is listed as a disputed claim by the Debtor in the amended list of creditors holding the twenty largest unsecured claims. The Debtor has recorded a reserve for contingencies of **$900,000** related to this claim. I cannot assess the merits of the Debtor's appeals or the adequacy of the reserve at this date.

**FAILURE TO PAY OVER TRUST FUND TAXES**
**AND**
**THE RESPONSIBLE PARTIES**

The Internal Revenue Service and the Pennsylvania Department of Revenue have determined who is responsible for the failure to pay over trust fund monies that were withheld from the salaries and wages of the Debtor's employees. In this case, numerous tax liens have been filed against the Covattos in significant amounts. This information is a matter of public record and was obtained from the Office of the Prothonotary of Erie County, Erie, Pennsylvania. I have

7

also been informed by the Debtor's Counsel that certain accounting employees of the Debtor have been determined to be responsible for the failure to pay over Commonwealth of Pennsylvania trust fund monies as well. I view the continuous delinquencies of the Debtor and the actions of the responsible parties as egregious acts. The U.S. Code at Title 26, Subtitle F, Chapter 75, Subchapter A, Part 1, Section 7202 provides for criminal penalties for willful failure to collect or pay over tax, which may be applicable in this case.

## THE POTENTIAL SALE OF THE COMPANY

The Debtor recently received a draft purchase agreement from Veteran Call Center, LLC (VCC). This document is attached at **Tab 7**.

VCC is a minority-controlled entity who has the ability, due to its ownership status, to attract contracts from national companies. VCC intends to acquire the debtor's assets, obtain new contracts, employ disabled veterans', and increase the Debtor's employment by as much as 200 new jobs. They anticipate a purchase price ranging from **$3,500,000 to $4,000,000**.

I reviewed the proposal and interviewed Kenneth Barton of VCC on December 8, 2010. Mr. Barton is the Director of Business Operations and the Managing Member of the entity. I informed Mr. Barton that I did not view VCC's proposal as one of substance because it was contingent on raising a combination of debt and equity from the capital markets, and I would not recommend that the Court consider it. There were other provisions contained in the agreement that were of concern but less problematic.

I requested of Mr. Barton that VCC revise their proposal prior to the Hearing. He fully understood that I have to be convinced that a transaction will be concluded within a reasonable period of time, and the outcome would exceed that of liquidation.

**During the course of my conversation with Mr. Barton, he indicated that the appointment of a Chapter 11 Trustee would result in the loss of customers, and his Company would have no interest in pursuing the Debtor. I have not validated that claim at this date.**

I spoke with Mr. Barton on December 9, 2010 and expect him to submit a revised proposal on behalf of VCC after the issuance of my report. I will be prepared to discuss its merits at the Hearing.

## FINDINGS OF THE EXAMINER

The Covattos, from the filing date of July 3, 2008, had ample time to remedy the Debtor's financial issues knowing the employment of family members and substantial rental payments to an entity owned by Alfred D. & Joyce M. Covatto were at risk. But in the twenty eight month period ended October 31, 2010, they were unable to and did not earn a profit, obtain a loan, attract an investor or find a buyer. Furthermore, they were unwilling to voluntarily reduce their compensation and rental income in a good faith effort to meet the inherent objectives of a Chapter 11 filing. In addition, the salaries of the management team as a group, which included their children, were not voluntarily or involuntarily reduced during the course of the Debtor's bankruptcy status.

When I considered their personal obligations to the various taxing authorities and financial institutions it became obvious to me that the Covattos would never be able to accumulate wealth

and the continuation of the status quo, that is the payment of Joyce M. Covattos salary and their receipt of rents from the Debtor, was their only opportunity to maintain their lifestyle, whatever it may be. If the Court permits the Debtor to continue as is or appoints a Chapter 11 Trustee, it is my opinion that the status quo will be maintained to the sole benefit of the Covattos.

If VCC submits a credible proposal, the Court should consider it and your Examiner would assist the Debtor in negotiating a transaction within a reasonable period of time.

If the VCC offer is not worthy of consideration, I recommend an immediate conversion to a Chapter 7 liquidation. You Examiner would be available to assist the Court and the Debtor to quickly and efficiently conclude the matter.

Report of the Federal Examiner

In the Matter of

Creditron Financial Corporation

d.b.a.

Teletron Marketing Group, Inc.

Chapter 11

Case Number:     08-11289-TPA

TABS

TAB 1

Tab 1

**Creditron Financial Corporation**
**Net Income (Loss), Sales, Officers' Salary and Staff Salaries**

| Month End | Net Income (Loss) | Sales | Officers' Salaries | Staff Salaries |
|---|---|---|---|---|
| Jul 2008 | 48,736.22 | 1,115,369.13 | 108,203.35 | 650,080.64 |
| Aug 2008 | 137,832.34 | 1,136,993.86 | 107,375.35 | 645,184.56 |
| Sep 2008 | 313,845.67 | 1,533,505.99 | 111,914.52 | 713,337.60 |
| Oct 2008 | 240,062.78 | 1,389,719.14 | 98,375.49 | 707,571.81 |
| Nov 2008 | 52,793.43 | 1,106,766.09 | 102,735.15 | 659,790.60 |
| Dec 2008 | (36,624.29) | 1,058,849.03 | 126,300.56 | 657,791.40 |
| Jan 2009 | (22,023.98) | 1,076,865.56 | 115,183.13 | 651,187.96 |
| Feb 2009 | (103,123.36) | 852,894.40 | 96,757.34 | 561,424.54 |
| Mar 2009 | (96,138.01) | 930,297.59 | 101,572.54 | 608,846.16 |
| Apr 2009 | (44,155.07) | 876,935.39 | 102,070.08 | 530,344.46 |
| May 2009 | (181,673.80) | 728,126.68 | 106,236.64 | 531,777.61 |
| Jun 2009 | (72,918.02) | 862,022.83 | 115,847.74 | 548,064.67 |
| Jul 2009 | (53,386.75) | 880,684.12 | 118,890.93 | 565,820.23 |
| Aug 2009 | (102,084.56) | 784,653.57 | 96,331.71 | 516,398.23 |
| Sep 2009 | 22,537.29 | 814,329.63 | 91,017.09 | 499,920.10 |
| Oct 2009 | 40,872.74 | 867,853.43 | 92,551.67 | 525,848.64 |
| Nov 2009 | (11,693.59) | 834,177.08 | 104,148.02 | 517,162.36 |
| Dec 2009 | (97,946.83) | 789,187.64 | 129,711.15 | 502,221.22 |
| Jan 2010 | (179,435.66) | 625,776.47 | 93,878.20 | 479,301.58 |
| Feb 2010 | (92,935.13) | 621,911.54 | 89,442.98 | 403,523.02 |
| Mar 2010 | 22,337.01 | 728,532.36 | 98,739.89 | 396,867.81 |
| Apr 2010 | 18,495.08 | 789,753.34 | 99,348.60 | 455,836.18 |
| May 2010 | (7,851.35) | 790,868.61 | 110,065.89 | 448,811.54 |
| Jun 2010 | 12,719.35 | 736,929.09 | 114,366.95 | 411,149.15 |
| Jul 2010 | (24,124.20) | 783,561.32 | 118,036.11 | 477,813.07 |
| Aug 2010 | 2,161.76 | 732,024.07 | 98,909.90 | 420,679.34 |
| Sep 2010 | 8,599.30 | 772,594.80 | 100,681.58 | 471,597.92 |
| Oct 2010 | 18,465.41 | 809,343.27 | 100,817.15 | 470,700.58 |
| **Total** | **(186,656.22)** | **25,030,526.03** | **2,949,509.71** | **15,029,052.98** |



TAB 2

**Tab 2**

**Creditron Financial Corporation**
**Rent Expense Paid to Boardwalk Business Square of Erie**

| Month End | Check Number or Wire | Date | Amount | Payee | |
| | | | | DollarBank | Boardwalk |
|---|---|---|---|---|---|
| Jul 2008 | Wire | 7/10/2010 | 17,163.41 | 17,163.41 | - |
| | | | 17,163.41 | 17,163.41 | - |
| | | | | | |
| Aug 2008 | Wire | 8/1/2008 | 16,663.81 | 16,663.81 | - |
| | 10113 | 8/7/2008 | 10,000.00 | - | 10,000.00 |
| | 10155 | 8/18/2008 | 10,615.19 | - | 10,615.19 |
| | Wire | 8/28/2008 | 16,611.06 | 16,611.06 | - |
| | | | 53,890.06 | 33,274.87 | 20,615.19 |
| | | | | | |
| Sep 2008 | Wire | 9/2/2008 | 5,000.00 | - | 5,000.00 |
| | Wire | 9/4/2008 | 5,000.00 | - | 5,000.00 |
| | 10237 | 9/12/2008 | 10,667.94 | - | 10,667.94 |
| | | | 20,667.94 | - | 20,667.94 |
| | | | | | |
| Oct 2008 | Wire | 10/3/2008 | 16,341.08 | 16,341.08 (1) | - |
| | 10336 | 10/7/2008 | 5,000.00 | - | 5,000.00 |
| | Wire | 10/9/2008 | 15,937.92 | 15,937.92 (1) | - |
| | | | 37,279.00 | 32,279.00 | 5,000.00 |
| | | | | | |
| Nov 2008 | 10455 | 11/5/2008 | 5,000.00 | - | 5,000.00 |
| | Wire | 11/5/2008 | 16,531.92 | 16,531.92 | - |
| | 10483 | 11/12/2008 | 10,000.00 | - | 10,000.00 |
| | 10501 | 11/20/2008 | 5,747.08 | - | 5,747.08 |
| | | | 37,279.00 | 16,531.92 | 20,747.08 |
| | | | | | |
| Dec 2008 | Wire | 12/2/2008 | 16,271.18 | 16,271.18 | - |
| | 10555 | 12/3/2008 | 6,000.00 | - | 6,000.00 |
| | 10557 | 12/4/2008 | 5,000.00 | - | 5,000.00 |
| | Wire | 12/8/2008 | 3,600.00 | - | 3,600.00 |
| | 10575 | 12/12/2008 | 11,407.82 | - | 11,407.82 |
| | Wire | 12/26/2008 | 7,000.00 | - | 7,000.00 |
| | | | 49,279.00 | 16,271.18 | 33,007.82 |
| | | | | | |
| Jan 2009 | Wire | 1/5/2009 | 2,000.00 | - | 2,000.00 |
| | Wire | 1/5/2009 | 16,448.83 | 16,448.83 | - |
| | 10691 | 1/12/2009 | 11,830.17 | - | 11,830.17 |
| | | | 30,279.00 | 16,448.83 | 13,830.17 |

**Tab 2 Continued**

| Month End | Check Number or Wire | Date | Amount | DollarBank | Boardwalk |
|---|---|---|---|---|---|
| Feb 2009 | 10774 | 2/3/2009 | 5,000.00 | - | 5,000.00 |
| | Wire | 2/3/2009 | 16,411.90 | 16,411.90 | - |
| | 10819 | 2/14/2009 | 7,500.00 | - | 7,500.00 |
| | 10820 | 2/17/2009 | 3,367.10 | - | 3,367.10 |
| | | | 32,279.00 | 16,411.90 | 15,867.10 |
| Mar 2009 | Wire | 3/3/2009 | 6,000.00 | - | 6,000.00 |
| | Wire | 3/5/2009 | 15,712.76 | 15,712.76 | - |
| | Wire | 3/9/2009 | 2,000.00 | - | 2,000.00 |
| | 10916 | 3/13/2009 | 7,500.00 | - | 7,500.00 |
| | Wire | 3/17/2009 | 1,000.00 | - | 1,000.00 |
| | Wire | 3/24/2009 | 2,500.00 | - | 2,500.00 |
| | | | 34,712.76 | 15,712.76 | 19,000.00 |
| Apr 2009 | 10996 | 4/6/2009 | 2,000.00 | - | 2,000.00 |
| | Wire | 4/7/2009 | 16,331.45 | 16,331.45 (1) | - |
| | 11000 | 4/9/2009 | 566.24 | - | 566.24 |
| | 11012 | 4/10/2009 | 3,000.00 | - | 3,000.00 |
| | 11021 | 4/15/2009 | 7,500.00 | - | 7,500.00 |
| | 11027 | 4/16/2009 | 3,000.00 | - | 3,000.00 |
| | 11058 | 4/17/2009 | 5,200.00 | - | 5,200.00 |
| | 11062 | 4/20/2009 | 2,247.55 | - | 2,247.55 |
| | | | 39,845.24 | 16,331.45 | 23,513.79 |
| May 2009 | Wire | 5/5/2009 | 2,000.00 | - | 2,000.00 |
| | Wire | 5/5/2009 | 16,075.98 | 16,075.98 | - |
| | 11137 | 5/9/2009 | 1,500.00 | - | 1,500.00 |
| | 11139 | 5/12/2009 | 17,500.00 | - | 17,500.00 |
| | 11166 | 5/28/2009 | 203.02 | - | 203.02 |
| | | | 37,279.00 | 16,075.98 | 21,203.02 |
| Jun 2009 | 11176 | 6/1/2009 | 1,000.00 | - | 1,000.00 |
| | 11180 | 6/2/2009 | 6,000.00 | - | 6,000.00 |
| | Wire | 6/2/2009 | 16,336.59 | 16,336.59 (1) | - |
| | 11227 | 6/15/2009 | 8,500.00 | - | 8,500.00 |
| | 11243 | 6/19/2009 | 1,000.00 | - | 1,000.00 |
| | 11249 | 6/23/2009 | 700.00 | - | 700.00 |
| | Wire | 6/24/2009 | 2,000.00 | - | 2,000.00 |
| | | | 35,536.59 | 16,336.59 | 19,200.00 |

**Tab 2 Continued**

| Month End | Check Number or Wire | Date | Amount | DollarBank | Boardwalk |
|---|---|---|---|---|---|
| Jul 2009 | 11279 | 7/6/2009 | 1,000.00 | - | 1,000.00 |
| | 11281 | 7/7/2009 | 1,000.00 | - | 1,000.00 |
| | Wire | 7/17/2009 | 16,710.60 | 16,710.60 | - |
| | 11335 | 7/22/2009 | 500.00 | | 500.00 |
| | Wire | 7/27/2009 | 600.00 | - | 600.00 |
| | | | 19,810.60 | 16,710.60 | 3,100.00 |
| Aug 2009 | Wire | 8/4/2009 | 15,350.00 | - | 15,350.00 |
| | Wire | 8/10/2009 | 16,270.66 | 16,270.66 | - |
| | 11395 | 8/17/2009 | 800.00 | - | 800.00 |
| | 11431 | 8/24/2009 | 500.00 | | 500.00 |
| | Wire | 8/27/2009 | 2,000.00 | - | 2,000.00 |
| | Wire | 8/28/2009 | 1,000.00 | - | 1,000.00 |
| | Wire | 8/28/2009 | 1,100.00 | - | 1,100.00 |
| | | | 37,020.66 | 16,270.66 | 20,750.00 |
| Sep 2009 | Wire | 9/1/2009 | 8,000.00 | - | 8,000.00 |
| | Wire | 9/4/2009 | 1,500.00 | - | 1,500.00 |
| | Wire | 9/10/2000 | 1,500.00 | - | 1,500.00 |
| | Wire | 9/14/2009 | 16,861.16 | 16,861.16 | - |
| | 11505 | 9/15/2009 | 9,000.00 | - | 9,000.00 |
| | Wire | 9/21/2009 | 1,500.00 | - | 1,500.00 |
| | Wire | 9/25/2009 | 1,000.00 | - | 1,000.00 |
| | | | 39,361.16 | 16,861.16 | 22,500.00 |
| Oct 2009 | Wire | 10/5/2009 | 6,000.00 | - | 6,000.00 |
| | 11566 | 10/6/2009 | 4,200.00 | - | 4,200.00 |
| | Wire | 10/7/2009 | 700.00 | - | 700.00 |
| | Wire | 10/9/2009 | 15,980.89 | 15,980.89 | - |
| | 11587 | 10/20/2009 | 2,300.00 | - | 2,300.00 |
| | 11629 | 10/24/2009 | 1,611.16 | - | 1,611.16 |
| | 11635 | 10/29/2009 | 900.00 | - | 900.00 |
| | | | 31,692.05 | 15,980.89 | 15,711.16 |
| Nov 2009 | Wire | 11/2/2009 | 1,500.00 | - | 1,500.00 |
| | 11670 | 11/3/2009 | 15,500.00 | - | 15,500.00 |
| | 11672 | 11/3/2009 | 4,100.00 | - | 4,100.00 |
| | 11673 | 11/3/2009 | 2,000.00 | - | 2,000.00 |
| | 11701 | 11/14/2009 | 900.00 | - | 900.00 |
| | Wire | 11/16/2009 | 16,773.10 | 16,773.10  (1) | - |
| | 11706 | 11/18/2009 | 4,500.00 | - | 4,500.00 |
| | Wire | 11/20/2009 | 10,000.00 | - | 10,000.00 |
| | Wire | 11/23/2009 | 2,000.00 | - | 2,000.00 |
| | Wire | 11/27/2009 | 3,000.00 | - | 3,000.00 |
| | | | 60,273.10 | 16,773.10 | 43,500.00 |

**Tab 2 Continued**

| Month End | Check Number or Wire | Date | Amount | DollarBank | Boardwalk |
|---|---|---|---|---|---|
| Dec 2009 | Wire | 12/1/2009 | 1,000.00 | - | 1,000.00 |
| | Wire | 12/2/2009 | 700.00 | - | 700.00 |
| | Wire | 12/3/2009 | 5,000.00 | - | 5,000.00 |
| | Wire | 12/4/2009 | 600.00 | - | 600.00 |
| | 11764 | 12/5/2009 | 1,000.00 | - | 1,000.00 |
| | Wire | 12/7/2009 | 1,000.00 | - | 1,000.00 |
| | 11782 | 12/15/2009 | 900.00 | - | 900.00 |
| | Wire | 12/16/2009 | 16,520.46 | 16,520.46 | - |
| | 11796 | 12/18/2009 | 2,000.00 | - | 2,000.00 |
| | 11798 | 12/19/2009 | 900.00 | - | 900.00 |
| | 11804 | 12/23/2009 | 1,500.00 | - | 1,500.00 |
| | Wire | 12/29/2009 | 500.00 | - | 500.00 |
| | Wire | 12/29/2009 | 1,000.00 | - | 1,000.00 |
| | 11821 | 12/31/2009 | 800.00 | - | 800.00 |
| | | | 33,420.46 | 16,520.46 | 16,900.00 |
| Jan 2010 | 11839 | 1/6/2010 | 7,900.00 | - | 7,900.00 |
| | Wire | 1/6/2010 | 16,064.91 | 16,064.91 | - |
| | 11852 | 1/8/2010 | 600.00 | - | 600.00 |
| | Wire | 1/8/2010 | 1,000.00 | - | 1,000.00 |
| | | | 25,564.91 | 16,064.91 | 9,500.00 |
| Feb 2010 | 11904 | 2/5/2010 | 7,900.00 | - | 7,900.00 |
| | 11909 | 2/8/2010 | 500.00 | - | 500.00 |
| | Wire | 2/9/2010 | 600.00 | - | 600.00 |
| | Wire | 2/10/2010 | 615.00 | - | 615.00 |
| | 11925 | 2/16/2010 | 950.00 | - | 950.00 |
| | 11930 | 2/17/2010 | 1,500.00 | - | 1,500.00 |
| | Wire | 2/17/2010 | 2,050.00 | - | 2,050.00 |
| | Wire | 2/17/2010 | 16,638.87 | 16,638.87 | - |
| | Wire | 2/22/2010 | 2,500.00 | - | 2,500.00 |
| | | | 33,253.87 | 16,638.87 | 16,615.00 |
| Mar 2010 | 11966 | 3/2/2010 | 1,858.82 | - | 1,858.82 |
| | 11972 | 3/4/2010 | 8,000.00 | - | 8,000.00 |
| | 11975 | 3/5/2010 | 1,000.00 | - | 1,000.00 |
| | Wire | 3/9/2010 | 1,000.00 | - | 1,000.00 |
| | 11996 | 3/16/2010 | 200.00 | - | 200.00 |
| | Wire | 3/18/2010 | 15,966.30 | 15,966.30 | - |
| | 12001 | 3/19/2010 | 600.00 | - | 600.00 |
| | Wire | 3/24/2010 | 950.00 | - | 950.00 |
| | 12019 | 3/31/2010 | 100.00 | - | 100.00 |
| | | | 29,675.12 | 15,966.30 | 13,708.82 |

**Tab 2 Continued**

| Month End | Check Number or Wire | Date | Amount | DollarBank | Boardwalk |
|-----------|----------------------|------|--------|------------|-----------|
| Apr 2010 | Wire | 4/2/2010 | 2,200.00 | - | 2,200.00 |
| | 12029 | 4/5/2010 | 8,900.00 | - | 8,900.00 |
| | Wire | 4/13/2010 | 200.00 | - | 200.00 |
| | 12052 | 4/14/2010 | 1,000.00 | - | 1,000.00 |
| | Wire | 4/15/2010 | 1,200.00 | - | 1,200.00 |
| | 12065 | 4/19/2010 | 200.00 | - | 200.00 |
| | Wire | 4/20/2010 | 1,000.00 | - | 1,000.00 |
| | 12070 | 4/21/2010 | 500.00 | - | 500.00 |
| | 12076 | 4/23/2010 | 900.00 | - | 900.00 |
| | 12079 | 4/24/2010 | 800.00 | - | 800.00 |
| | Wire | 4/30/2010 | 16,568.97 | 16,568.97 | - |
| | | | 33,468.97 | 16,568.97 | 16,900.00 |
| May 2010 | 12119 | 5/3/2010 | 14,000.00 | - | 14,000.00 |
| | 12127 | 5/7/2010 | 1,000.00 | - | 1,000.00 |
| | Wire | 5/7/2010 | 2,000.00 | - | 2,000.00 |
| | Wire | 5/11/2010 | 300.00 | - | 300.00 |
| | Wire | 5/12/2010 | 7,500.00 | - | 7,500.00 |
| | Wire | 5/14/2010 | 5,000.00 | - | 5,000.00 |
| | 12146 | 5/19/2010 | 1,200.00 | - | 1,200.00 |
| | Wire | 5/21/2010 | 17,545.88 | 17,545.88 | - |
| | 12152 | 5/24/2010 | 600.00 | - | 600.00 |
| | 12154 | 5/25/2010 | 1,250.00 | - | 1,250.00 |
| | Wire | 5/28/2010 | 1,100.00 | - | 1,100.00 |
| | | | 51,495.88 | 17,545.88 | 33,950.00 |
| Jun 2010 | 12175 | 6/1/2010 | 700.00 | - | 700.00 |
| | Wire | 6/2/2010 | 10,000.00 | - | 10,000.00 |
| | 12179 | 6/3/2010 | 500.00 | - | 500.00 |
| | Wire | 6/4/2010 | 6,000.00 | - | 6,000.00 |
| | Wire | 6/15/2010 | 20,000.00 | - | 20,000.00 |
| | Wire | 6/18/2010 | 10,000.00 | - | 10,000.00 |
| | 12215 | 6/22/2010 | 2,100.00 | - | 2,100.00 |
| | Wire | 6/28/2010 | 16,549.74 | 16,549.74 | - |
| | | | 65,849.74 | 16,549.74 | 49,300.00 |
| Jul 2010 | 12233 | 7/1/2010 | 8,000.00 | - | 8,000.00 |
| | 12235 | 7/1/2010 | 1,000.00 | - | 1,000.00 |
| | Wire | 7/1/2010 | 7,000.00 | - | 7,000.00 |
| | Wire | 7/6/2010 | 10,000.00 | - | 10,000.00 |
| | 12264 | 7/14/2010 | 500.00 | - | 500.00 |
| | Wire | 7/19/2010 | 16,281.75 | 16,281.75 | - |
| | | | 42,781.75 | 16,281.75 | 26,500.00 |

**Tab 2 Continued**

| Month End | Check Number or Wire | Date | Amount | DollarBank | Boardwalk |
|---|---|---|---|---|---|
| Aug 2010 | 12317 | 8/4/2010 | 7,900.00 | - | 7,900.00 |
| | 123318 | 8/4/2010 | 800.00 | - | 800.00 |
| | Wire | 8/6/2010 | 4,000.00 | - | 4,000.00 |
| | 12350 | 8/18/2010 | 300.00 | - | 300.00 |
| | 12359 | 8/20/2010 | 1,800.00 | - | 1,800.00 |
| | 12358 | 8/20/2010 | 2,450.00 | - | 2,450.00 |
| | 12365 | 8/23/2010 | 1,800.00 | - | 1,800.00 |
| | Wire | 8/25/2010 | 16,443.49 | 16,443.49 | - |
| | | | 35,493.49 | 16,443.49 | 19,050.00 |
| Sep 2010 | Wire | 9/2/2010 | 1,600.00 | - | 1,600.00 |
| | 12412 | 9/17/2010 | 9,500.00 | - | 9,500.00 |
| | 12413 | 9/17/2010 | 1,000.00 | - | 1,000.00 |
| | 12446 | 9/20/2010 | 1,800.00 | - | 1,800.00 |
| | Wire | 9/27/2010 | 1,000.00 | - | 1,000.00 |
| | | | 14,900.00 | - | 14,900.00 |
| Oct 2010 | 12471 | 10/1/2010 | 300.00 | - | 300.00 |
| | 12478 | 10/4/2010 | 200.00 | - | 200.00 |
| | Wire | 10/4/2010 | 16,421.12 | 16,421.12 | - |
| | Wire | 10/4/2010 | 11,300.00 | - | 11,300.00 |
| | Wire | 10/5/2010 | 2,000.00 | - | 2,000.00 |
| | 12492 | 10/12/2010 | 300.00 | - | 300.00 |
| | 12503 | 10/14/2010 | 1,100.00 | - | 1,100.00 |
| | Wire | 10/15/2010 | 12,000.00 | - | 12,000.00 |
| | 12515 | 10/18/2010 | 1,400.00 | - | 1,400.00 |
| | 12518 | 10/19/2010 | 1,300.00 | - | 1,300.00 |
| | Wire | 10/22/2010 | 1,500.00 | - | 1,500.00 |
| | 12531 | 10/25/2010 | 1,400.00 | - | 1,400.00 |
| | Wire | 10/29/2010 | 16,161.51 | 16,161.51 | - |
| | | | 65,382.63 | 32,582.63 | 32,800.00 |
| | Total | | 1,044,934.39 | 476,597.30 | 568,337.09 |

(1) Improperly coded as a deposit to Boardwalk.



TAB 3

**Tab 3**

**Creditron Financial Corporation**
**Intangible Asset Improperly Reflected as Current Asset in Operating Reports**

| Month End | Amount |
|-----------|--------------|
| Jul 2008 | 4,883,747.69 |
| Aug 2008 | 4,879,036.75 |
| Sep 2008 | 4,879,036.75 |
| Oct 2008 | 4,879,036.75 |
| Nov 2008 | 4,879,036.75 |
| Dec 2008 | 4,880,736.81 |
| Jan 2009 | 4,880,736.81 |
| Feb 2009 | 4,880,736.81 |
| Mar 2009 | 4,882,936.81 |
| Apr 2009 | 4,882,936.81 |
| May 2009 | 4,882,736.81 |
| Jun 2009 | 4,882,536.81 |
| Jul 2009 | 4,882,336.81 |
| Aug 2009 | 4,883,196.46 |
| Sep 2009 | 4,883,196.46 |
| Oct 2009 | 4,883,196.46 |
| Nov 2009 | 4,883,196.46 |
| Dec 2009 | 4,883,196.46 |
| Jan 2010 | 4,881,096.46 |
| Feb 2010 | 4,881,096.46 |
| Mar 2010 | 4,881,096.46 |
| Apr 2010 | 4,881,096.46 |
| May 2010 | 4,881,096.46 |
| Jun 2010 | 4,881,096.46 |
| Jul 2010 | 4,881,096.46 |
| Aug 2010 | 4,881,096.46 |
| Sep 2010 | 4,881,096.46 |
| Oct 2010 | 4,881,096.46 |



TAB 4

**Tab 4**

# SHAPIRA, HUTZELMAN, BERLIN, ELY, SMITH AND WALSH

ATTORNEYS AND COUNSELORS AT LAW
305 WEST SIXTH STREET
ERIE, PENNSYLVANIA 16507

TELEPHONE - 814/452-6800
FAX - 814/456-2227
www.shapiralaw.com

GARY J SHAPIRA*
STEPHEN H HUTZELMAN
STANLEY G BERLIN
THEODORE B ELY II
RANDY L SHAPIRA
EDWIN W SMITH
JOSEPH M WALSH III
SUE A BECK
JASON A CHECQUE

DECEASED
HOWARD H PLATE
JOSEPH M WALSH JR
RETIRED
JOSEPH J MAY
*CERTIFIED CIVIL TRIAL ADVOCATE
REFER TO
Stephen H. Hutzelman
e-mail shutzelman@shapiralaw.com

## FACSIMILE TRANSMISSION

DATE: _12/7/10_          NO. OF PAGES IN THIS FAX: _2_

TO: _James Schaffner_

COMPANY _Schaffner, Knight Minnaugh_

FROM: _Stephen H Hutzelman, Esq_

FAX _454-1476_          PHONE _____

RE _Creditron_

MESSAGE _See attached_

IF THERE IS ANY PROBLEM IN TRANSMISSION
PLEASE CONTACT THIS OFFICE AT THE ABOVE NUMBER

# Cathy Hawthorne

**From:**    A.D COVATTO [ADC@telatron com]
**Sent:**    Tuesday, December 07, 2010 2:36 PM
**To:**      Steve Hutzelman
**Subject:** FW

Dear Attorney Hutzelman,

The info listed below is the basis for the intangible assets shown on the books. For example, we have a predictive dialer that we developed. If you were to purchase this software it would cost about 1.2million alone. This info was provided to VCC

Intangible Assets

The intangible Assets are those assets that we consider not physical. For example, intellectual property the value of the knowledge our people have relative to outbound and customer service type programs. Also, the value of the knowledge our MIS Staff contributes to the success of programs Additionally, the value of all informational resources our company has at its disposal that is used to drive profits, gain new customers and create new customized programs for clients. We have spent many thousands of dollars annually in training our employees so as to increase the competence of our staff The result is a return to the company , one that can contribute toward many years worth of business value

Finally, there is brand name identification, certain business methodologies and software development that we consider valuable to the companys long term success

ATTENTION. This message is intended only for the individual to whom it is addressed It contains information that may be confidential under law If you are not the intended recipient or agent responsible for delivering this message, do not read, copy or distribute this information If you have received this information in error, please notify us immediately and delete it from your computer Opinions, conclusions and other information in this message that do not relate to official Telatron Marketing Group, Inc business are those of the sender and are neither given nor endorsed by Telatron Marketing Group Inc


TAB 5

**Tab 5**

**Creditron Financial Corporation**
**Quick Assets Analysis**

| Month End | Cash | Accounts Receivable | Total |
|---|---|---|---|
| Jul 2008 | 39,404.78 | 1,156,846.21 | 1,196,250.99 |
| Aug 2008 | 136,704.28 | 1,121,026.52 | 1,257,730.80 |
| Sep 2008 | 71,956.13 | 1,719,183.43 | 1,791,139.56 |
| Oct 2008 | 222,638.90 | 1,488,253.81 | 1,710,892.71 |
| Nov 2008 | 173,976.88 | 1,558,628.06 | 1,732,604.94 |
| Dec 2008 | 439,987.76 | 1,292,579.23 | 1,732,566.99 |
| Jan 2009 | 312,219.61 | 1,465,477.71 | 1,777,697.32 |
| Feb 2009 | 172,528.00 | 1,400,215.04 | 1,572,743.04 |
| Mar 2009 | 88,493.76 | 1,382,315.31 | 1,470,809.07 |
| Apr 2009 | 19,140.52 | 1,407,569.41 | 1,426,709.93 |
| May 2009 | 14,282.01 | 1,251,219.95 | 1,265,501.96 |
| Jun 2009 | 5,020.53 | 1,258,568.25 | 1,263,588.78 |
| Jul 2009 | 1,965.52 | 1,357,916.02 | 1,359,881.54 |
| Aug 2009 | 3,408.88 | 1,214,538.56 | 1,217,947.44 |
| Sep 2009 | 1,771.47 | 1,204,263.16 | 1,206,034.63 |
| Oct 2009 | 141,483.72 | 982,994.28 | 1,124,478.00 |
| Nov 2009 | 3,625.88 | 1,282,707.51 | 1,286,333.39 |
| Dec 2009 | 53,998.52 | 982,335.20 | 1,036,333.72 |
| Jan 2010 | 1,612.45 | 1,067,631.75 | 1,069,244.20 |
| Feb 2010 | 106,393.34 | 713,350.88 | 819,744.22 |
| Mar 2010 | 113,275.26 | 850,561.20 | 963,836.46 |
| Apr 2010 | 46,652.71 | 920,659.32 | 967,312.03 |
| May 2010 | 107,142.25 | 909,939.50 | 1,017,081.75 |
| Jun 2010 | 133,557.90 | 902,311.33 | 1,035,869.23 |
| Jul 2010 | 98,729.57 | 889,924.44 | 988,654.01 |
| Aug 2010 | 81,502.58 | 863,177.05 | 944,679.63 |
| Sep 2010 | 1,738.14 | 1,200,929.25 | 1,202,667.39 |
| Oct 2010 | 121,385.69 | 1,026,163.90 | 1,147,549.59 |

**Tab 5 Continued**

**Creditron Financial Corporation**
**Certain Current Liabilities Analysis**

| Month End | Trade Account Payables | Note Payable - Dollar Bank | IRS | PA. Dept Revenue | Local W/H | Accrued Payroll | Other | Total |
|---|---|---|---|---|---|---|---|---|
| Jul 2008 | 623,561.34 | 499,316.00 | 1,796,103.81 | 797,152.30 | 382,646.29 | 222,512.35 | 19,436.82 | 4,340,728.91 |
| Aug 2008 | 581,734.82 | 499,316.00 | 1,815,089.03 | 803,383.76 | 385,172.36 | 168,978.79 | 8,915.47 | 4,262,590.23 |
| Sep 2008 | 679,702.01 | 499,316.00 | 1,831,926.94 | 807,843.35 | 387,999.69 | 234,410.76 | 4,824.05 | 4,446,022.80 |
| Oct 2008 | 629,771.29 | 499,316.00 | 1,722,133.80 | 751,930.88 | 386,969.58 | 109,423.79 | 4,595.01 | 4,104,140.35 |
| Nov 2008 | 540,891.78 | 499,316.00 | 1,717,276.73 | 743,231.59 | 389,249.54 | 142,632.13 | 4,609.19 | 4,037,206.96 |
| Dec 2008 | 533,794.65 | 499,316.00 | 1,722,244.75 | 746,366.87 | 391,750.22 | 198,215.82 | 20,260.96 | 4,111,949.27 |
| Jan 2009 | 643,719.40 | 499,316.00 | 1,710,198.54 | 741,166.80 | 391,276.66 | 151,413.97 | 12,643.54 | 4,149,734.91 |
| Feb 2009 | 587,100.16 | 499,316.00 | 1,691,908.49 | 728,982.70 | 391,211.90 | 150,992.42 | 12,640.82 | 4,062,152.49 |
| Mar 2009 | 587,445.90 | 499,316.00 | 1,688,610.86 | 720,810.50 | 391,696.05 | 187,935.74 | 12,640.82 | 4,088,455.87 |
| Apr 2009 | 616,713.41 | 499,316.00 | 1,654,404.98 | 711,461.87 | 389,700.16 | 179,691.00 | 12,551.72 | 4,063,839.14 |
| May 2009 | 676,782.00 | 499,316.00 | 1,653,537.48 | 703,726.25 | 390,371.71 | 118,804.89 | 12,562.67 | 4,055,101.00 |
| Jun 2009 | 663,579.53 | 499,316.00 | 1,656,241.07 | 696,045.99 | 391,209.67 | 177,142.78 | 12,590.14 | 4,096,125.18 |
| Jul 2009 | 782,798.93 | 499,316.00 | 1,667,749.63 | 697,462.12 | 392,097.91 | 114,130.65 | 13,667.49 | 4,167,222.73 |
| Aug 2009 | 730,624.30 | 499,316.00 | 1,675,024.73 | 698,558.28 | 392,512.46 | 159,317.45 | 14,232.10 | 4,169,585.32 |
| Sep 2009 | 680,304.66 | 499,316.00 | 1,647,345.78 | 685,710.38 | 391,398.76 | 191,553.54 | 12,612.30 | 4,108,241.42 |
| Oct 2009 | 695,673.77 | 499,316.00 | 1,578,284.42 | 681,111.80 | 389,988.33 | 135,703.44 | 4,738.89 | 3,984,816.65 |
| Nov 2009 | 732,463.44 | 499,316.00 | 1,592,710.10 | 684,208.62 | 390,806.25 | 182,388.73 | 5,828.04 | 4,087,721.18 |
| Dec 2009 | 656,742.87 | 499,316.00 | 1,534,121.71 | 679,763.43 | 387,606.17 | 220,771.15 | 4,436.04 | 3,982,757.37 |
| Jan 2010 | 817,627.71 | 499,316.00 | 1,625,300.99 | 710,947.79 | 394,126.92 | 123,250.60 | 4,805.00 | 4,175,375.01 |
| Feb 2010 | 721,737.12 | 499,316.00 | 1,599,066.45 | 699,639.01 | 392,514.91 | 120,890.06 | 4,769.15 | 4,037,932.70 |
| Mar 2010 | 717,969.80 | 499,316.00 | 1,664,040.94 | 718,430.30 | 396,403.64 | 158,631.94 | 7,458.37 | 4,162,350.99 |
| Apr 2010 | 701,262.91 | 499,316.00 | 1,730,776.39 | 723,661.42 | 398,865.85 | 75,823.47 | 3,860.22 | 4,133,566.26 |
| May 2010 | 664,026.88 | 499,316.00 | 1,766,176.12 | 754,855.93 | 406,550.50 | 115,913.91 | 5,128.57 | 4,211,967.91 |
| Jun 2010 | 644,298.38 | 499,316.00 | 1,767,504.96 | 767,974.85 | 414,294.73 | 156,024.60 | 5,371.02 | 4,254,784.54 |
| Jul 2010 | 674,012.15 | 499,316.00 | 1,748,434.97 | 760,881.79 | 422,764.41 | 121,537.58 | 5,632.59 | 4,232,579.49 |
| Aug 2010 | 640,572.12 | 499,316.00 | 1,742,281.10 | 763,106.18 | 405,404.44 | 149,035.63 | 5,057.23 | 4,204,772.70 |
| Sep 2010 | 660,726.70 | 499,316.00 | 1,869,523.88 | 788,232.55 | 413,250.22 | 192,011.70 | 5,307.69 | 4,428,368.74 |
| Oct 2010 | 681,077.50 | 499,316.00 | 1,944,462.19 | 766,818.66 | 421,943.76 | 107,662.41 | 5,524.87 | 4,426,805.39 |

**Tab 5 Continued**

**Creditron Financial Corporation**
**Summary of Quick Assets and Certain Current Liabilities**

| Month End | Quick Assets | Certain Current Liabilities | Deficiency |
|-----------|--------------|------------------------------|------------|
| Jul 2008 | 1,196,250.99 | 4,340,728.91 | (3,144,477.92) |
| Aug 2008 | 1,257,730.80 | 4,262,590.23 | (3,004,859.43) |
| Sep 2008 | 1,791,139.56 | 4,446,022.80 | (2,654,883.24) |
| Oct 2008 | 1,710,892.71 | 4,104,140.35 | (2,393,247.64) |
| Nov 2008 | 1,732,604.94 | 4,037,206.96 | (2,304,602.02) |
| Dec 2008 | 1,732,566.99 | 4,111,949.27 | (2,379,382.28) |
| Jan 2009 | 1,777,697.32 | 4,149,734.91 | (2,372,037.59) |
| Feb 2009 | 1,572,743.04 | 4,062,152.49 | (2,489,409.45) |
| Mar 2009 | 1,470,809.07 | 4,088,455.87 | (2,617,646.80) |
| Apr 2009 | 1,426,709.93 | 4,063,839.14 | (2,637,129.21) |
| May 2009 | 1,265,501.96 | 4,055,101.00 | (2,789,599.04) |
| Jun 2009 | 1,263,588.78 | 4,096,125.18 | (2,832,536.40) |
| Jul 2009 | 1,359,881.54 | 4,167,222.73 | (2,807,341.19) |
| Aug 2009 | 1,217,947.44 | 4,169,585.32 | (2,951,637.88) |
| Sep 2009 | 1,206,034.63 | 4,108,241.42 | (2,902,206.79) |
| Oct 2009 | 1,124,478.00 | 3,984,816.65 | (2,860,338.65) |
| Nov 2009 | 1,286,333.39 | 4,087,721.18 | (2,801,387.79) |
| Dec 2009 | 1,036,333.72 | 3,982,757.37 | (2,946,423.65) |
| Jan 2010 | 1,069,244.20 | 4,175,375.01 | (3,106,130.81) |
| Feb 2010 | 819,744.22 | 4,037,932.70 | (3,218,188.48) |
| Mar 2010 | 963,836.46 | 4,162,350.99 | (3,198,514.53) |
| Apr 2010 | 967,312.03 | 4,133,566.26 | (3,166,254.23) |
| May 2010 | 1,017,081.75 | 4,211,967.91 | (3,194,886.16) |
| Jun 2010 | 1,035,869.23 | 4,254,784.54 | (3,218,915.31) |
| Jul 2010 | 988,654.01 | 4,232,579.49 | (3,243,925.48) |
| Aug 2010 | 944,679.63 | 4,204,772.70 | (3,260,093.07) |
| Sep 2010 | 1,202,667.39 | 4,428,368.74 | (3,225,701.35) |
| Oct 2010 | 1,147,549.59 | 4,426,805.39 | (3,279,255.80) |

TAB 6

**Tab 6**

**Creditron Financial Corporation**
**Covatto Salary Analysis**

| Quarter Ended | Name | Amount |
|---|---|---|
| 12/31/2008 | Covatto, Amelia | 207.35 |
| | Covatto, Renee | 13,071.68 |
| | Covatto, Andrea | 12,749.93 |
| | Covatto, Joyce | 9,691.93 |
| | Laird, Thomas | 16,153.77 |
| 3/31/2009 | Covatto, Renee | 13,312.00 |
| | Covatto, Andrea | 11,749.92 |
| | Covatto, Joyce | 8,307.36 |
| | Covatto, Tracy | 3,348.38 |
| | Laird, Thomas | 13,846.08 |
| 6/30/2009 | Covatto, Renee | 13,312.00 |
| | Covatto, Andrea | 11,749.92 |
| | Covatto, Ashley | 185.20 |
| | Covatto, Joyce | 9,691.92 |
| | Covatto, Tracy | 7,280.00 |
| | Laird, Thomas | 16,153.76 |
| 9/30/2009 | Covatto, Renee | 13,312.00 |
| | Covatto, Andrea | 11,749.96 |
| | Covatto, Ashley | 65.20 |
| | Covatto, Joyce | 8,307.36 |
| | Covatto, Tracy | 4,124.12 |
| | Laird, Thomas | 4,615.37 |
| 12/31/2009 | Covatto, Renee | 13,312.00 |
| | Covatto, Andrea | 11,749.95 |
| | Covatto, Joyce | 9,691.94 |
| | Covatto, Tracy | 6,678.00 |
| | Laird, Thomas | 10,153.82 |
| 3/31/2010 | Covatto, Renee | 13,312.00 |
| | Covatto, Andrea | 11,749.94 |
| | Covatto, Joyce | 8,307.37 |
| | Covatto, Tracy | 7,022.26 |
| | Laird, Thomas | 13,846.11 |
| 6/30/2010 | Covatto, Renee | 13,312.00 |

**Tab 6 Continued**

| Quarter Ended | Name | Amount |
|---|---|---|
| | Covatto, Andrea | 11,749.93 |
| | Covatto, Ashley | 879.40 |
| | Covatto, Joyce | 9,691.93 |
| | Covatto, Tracy | 6,610.66 |
| | Laird, Thomas | 16,153.79 |
| 9/30/2010 | Covatto, Renee | 13,312.00 |
| | Covatto, Andrea | 11,749.94 |
| | Covatto, Ashley | 1,349.50 |
| | Covatto, Joyce | 8,307.38 |
| | Covatto, Tracy | 7,269.08 |
| | Laird, Thomas | 13,846.10 |
| | **Total** | **423,040.31** |



TAB 7

THIS PURCHASE AGREEMENT ("Agreement") is made and entered into this 6th day of December, 2019, by and among Veteran Call Center, LLC, a Virginia Limited Liability Company, or its nominee(s) ("Purchaser"), Creditron Financial Corporation /dba Telatron Marketing Group, Inc., a Pennsylvania corporation, Boardwalk Business Square, Inc., a Pennsylvania corporation and Alfred D. and Joyce M. Covatto, residents of Pennsylvania (together the "Seller").

## W I T N E S S E T H:

WHEREAS, Seller is engaged in the business of providing contact center services; and

WHEREAS, Purchaser desires to acquire from Seller, and Seller desires to sell to Purchaser, certain of the assets and property of Seller upon the terms hereinafter set forth.

NOW, THEREFORE, in consideration of the promises and mutual covenants herein contained, and for other good and valuable consideration, the mutual receipt and sufficiency of which are hereby acknowledged, the parties hereby agree as follows:

**1.; Option and Option Obligation; Sale and Purchase of Assets; Settlement and Assumption of Liabilities**.

1.1 **Option:** Seller hereby grants to Purchaser an option (the "Option") to purchase the "Acquired Assets", as defined below, on the terms and conditions set forth in this Agreement. The Option may be exercised at any time on or before July 31st, 2011, on five days prior written notice to Seller.

1.2 **Option Obligation:** Buyer is obligated to exercise this option conditionally upon capital raising completion for financing needed to settle creditor liabilities as listed in **Schedule 1.4** subject to negotiated acceptable settlement arrangements.

In consideration of the grant of the Option, Purchaser will loan Seller financing to pay third party professional service firms an amount not to be less then $75,000.00 and not to exceed $200,000.00 for professional services on Sellers behalf as described below (all third party professional services must be approved in writing). Financing loaned will be paid directly to third party professional service firms. All loans provided by the Purchaser are secured by assets described in Section 1.2 of this agreement (creditors listed in **Schedule 1.4** have priority interest in these assets):

    i: $20,000 - $50,000 for general legal costs with a Pennsylvania based law firm designated as Dilworth Paxson to negotiate settlements with Secured Creditors as listed in **Schedule 1.4**, and

    ii: $80,000 - $150,000 to engage Tactilis Asset Management LLP to

**Tab 7 Continued**

perform due diligence, structure and raise capital to settle liabilities and obligations with Sellers creditors as listed in **Schedule 1.4** after negotiations as described above are concluded.

1.3 **Sale and Purchase of Assets:** Subject to the terms and conditions set forth in this Agreement, at the Closing, Sellers shall sell, assign, transfer and deliver, free and clear of all liens, security interests and other encumbrances, to Purchaser, and Purchaser shall purchase, acquire and take assignment and delivery of the following assets owned by Sellers (wherever located) related to, or used in conjunction with, the Business, and all of Sellers' right, title and interest therein and thereto (all of the assets to be sold, assigned, transferred and delivered to Purchaser hereunder shall be deemed included in the term "Acquired Assets" as used herein):

a. All patents, copyrights, trademarks, trade names, logos, and other intellectual property, material intangible assets utilized in the business and product licenses set forth on **Schedule 1.3(a)** hereto;

b. Employees agreements and contracts as disclosed in **Schedule 1.3(b)** (the "Employee Contracts") that will be individually evaluated and acquired at the option of the Seller. Sellers expressly understand that Purchaser has not agreed to hire any of Sellers' employees or independent contractors retained by Sellers.

c. All operating assets employed in Seller's ordinary course of business, including those set forth on **Schedule 1.3(c)**;

d. The real property, office and warehouse furniture and equipment employed in the operation of Seller's business as Purchaser shall select and as set forth in **Schedule 1.3(d)**;

e. All right, title and interest of Seller in, to, and under all executory contracts, including purchase, sale, and supply contracts, sale representative contracts, supplier and manufacturer warranties, and all leases of personal property as Purchaser shall select and as set forth on **Schedule 1.3(e)** (seller warrants that there are no change of control provisions in existing material contracts**)** hereto;

f. Seller's customer lists and records, supplier lists, sales representative lists, advertising and promotional materials and records and other business records related to Seller's operations;

g. Seller's research and development, software code, network architecture engineering drawings, methodologies, processes and designs and other records related to Seller's systems, solutions and services;

h. A covenant not-to-compete as hereinafter provided in **Section 6.2**.

1.4 **Settlement and Assumption of Liabilities**: Per terms in this agreement, at the Closing, Purchaser shall settle and/or assume those liabilities and obligations

**Tab 7 Continued**

of Seller set forth on **Schedule 1.4** (the "Assumed Liabilities") subject to negotiated acceptable settlement arrangements and conditional to successfully capital needed to cur liabilities from third party entities. All other liabilities or obligations of any nature shall not be assumed by Purchaser hereunder, but instead shall remain liabilities and obligations of Seller.

## 2. Considerations for Acquired Assets.

2.1 **Operating Assets, Real Property and Office Equipment:** The aggregate purchase price for the assets described in Sections 1.3(a), 1.3(b), 1.3(c), 1.3(d), 1.3(e), 1.3(f), 1.3(g) and 1.3(h) to be paid at the Closing shall be equal to the amount required to settle liabilities listed in **Schedule 1.4** after third party professional service firm described in 1.1 (i) of this agreement has negotiated settlement amounts with creditors as listed in **Schedule 1.4**. If Purchaser has negotiated payment terms over time for any of all of the liabilities listed in **Schedule 1.4** which results in releasing Alfred D. and Joyce M. Covatto of any liability or further obligations for liabilities listed in **Schedule 1.4**, this will be considered as payment in full. If Purchaser has negotiated payment terms over time for any of all of the liabilities listed in **Schedule 1.4** which results in not releasing Alfred D. and Joyce M. Covatto of liability or further obligations for liabilities listed in **Schedule 1.4**, Alfred D. and Joyce M. Covatto will approve at their discretion in writing that they accept such settlement as payment in full.

2.2 **Accounts Receivable:** Purchaser will collect Seller's accounts receivable not paid directly to Seller, account to Seller for such collections and pay to Seller the amounts collected on the 1st day of each month. Seller will promptly advise Purchaser of collections received by Seller. The first amounts customers of Seller remit to Purchaser shall be paid to Seller to the extent of the customers balance due to Seller that is not in dispute. Purchaser shall have no obligation to pursue collection of accounts of Seller that are not paid and shall return the unpaid accounts to Seller for collection by Seller 120 days following the Closing Date.

## 3. The Closing:

3.1 **Date, Time and Place of Closing:** Consummation of the sale and purchase set forth herein (the "Closing") shall take place on the date specified by Purchaser in the notice exercising the option but no later than July 31st, 2011, (the "Closing Date"), at 12:00 PM local time at the offices of 1545 West 38th Street, Erie, PA 16508.

3.2 **Deliveries by Seller:** The Seller shall deliver the following documents to the Purchaser at or before the Closing, all of which shall be in form and substance acceptable to the Purchaser and its counsel:

(i) Such bills of sale, endorsements, assignments, and other instruments of sale, transfer, conveyance, and assignment as shall be necessary or desirable to vest in Purchaser good and marketable title to the Acquired Assets free and clear of

**Tab 7 Continued**

all liens, security interests, charges, mortgage executions, and encumbrances of any type;

(ii) Consents and approvals of all third parties necessary for the Seller to execute, deliver, or perform this Agreement;

(iii) Certified copies of the corporate actions taken by the Board of Directors of Seller authorizing the execution, delivery, and performance of this Agreement;

(iv) Certificates of Good Standing for Seller from the Secretary of State of Pennsylvania no earlier than ten (10) days prior to the Closing Date;

(v) Such other and further documentation as Purchaser may reasonably require.

3.3 **Deliveries by Purchaser:** Purchaser shall deliver certified or bank cashier's checks for the amount to be paid on the Closing Date under **Section 2.1** and/or Purchaser will deliver to Seller an assumption of liabilities in form satisfactory to the parties pursuant to **Section 2.1**.

**4. Representations and Warranties of the Seller:** Seller hereby represents and warrants to Purchaser the following:

4.1 **Organization:** The Seller is a corporation duly organized, validly existing, and in good standing under the laws of the State of Pennsylvania. The Seller is qualified to do business and is in good standing in each jurisdiction listed on **Schedule 4.1** which are all jurisdictions in which the failure to be so qualified would have a material adverse effect on the business of Seller.

The Seller has all corporate power and authority and all licenses to own its property and to carry on its operations as now conducted by it and as contemplated by this Agreement.

4.2 **Corporate Action; Valid and Binding Agreements:** All corporate and shareholder action of Seller necessary to authorize the execution, delivery, and performance of this Agreement and each of the other agreements, instruments, and other documents to be delivered by the Seller in connection herewith has been properly taken. This Agreement and all such other agreements, instruments, and other documents have been duly and validly executed and delivered by, and constitute a valid and binding agreement of the Seller enforceable in accordance with its terms, subject as to enforcement to applicable equitable principles or bankruptcy, insolvency, reorganization, moratorium or other similar laws now or hereafter in effect generally affecting creditors' rights.

4.3 **No Violation:** Except as set forth on **Schedule 4.3**, neither the execution, the delivery of this Agreement, nor the consummation of the transaction contemplated hereby constitutes a violation of, or results in a breach of, or gives rise to a right of acceleration or termination under, (a) any term or provision of the respective Articles or Certificate of Incorporation or Bylaws of Seller, (b) any

**Tab 7 Continued**

agreement or commitment material to the business of Seller to which the Seller is bound, (c) any agreement, understanding, or commitment relating to any bank or other institutional loans or indebtedness of the Seller, or (d) any judgment, decree, order, regulation or rule of any court or governmental authority, or any statute or law. The execution, delivery, and consummation of this Agreement will neither result in the imposition of any lien, mortgage, pledge, encumbrance, easement, claim, or other restriction or charge on the Acquired Assets nor disrupt nor impair any material business relationship, which the Seller currently has with any dealer, distributor, sales representative, supplier, or customer. No consent, registration, or filing with any federal, state or local authority or other public or private body or person is required in connection with the execution and delivery of this Agreement and the performance of the transactions contemplated hereby or is required with respect to the transfer, except as set forth in **Schedule 4.3**.

4.4 **Tax Returns:** Except as set forth on **Schedule 4.4**, the Seller has duly filed all tax reports and returns which are required to be filed with respect to Seller and have fully paid or provided for all taxes and other charges due or claimed to be due by all federal, state, county, city, local, and foreign taxing authorities with respect to Seller. Seller has set up on its books adequate reserves for the payment of all taxes attributable to the period up to and including the Closing Date. There are no federal, state, county, city, local, or foreign tax liens upon any property or assets of Seller, and there are no unpaid taxes, interest, or penalties, which are or could become a lien on the Acquired Assets or require payment by Purchaser. Except as set forth on **Schedule 4.4**, there are no present audits or other discussions by any state, city, county, local, or foreign government concerning any income, property (tangible and intangible), franchise, sales, or any other tax returns filed by Seller. The Seller does not have any liability or deficiency (including, without limitation, interest and penalties) for taxes to any federal, state, county, city, local, or foreign taxing authority attributable to any fiscal period ending prior to the Closing Date for which the statutory period of limitations is still open. There are no outstanding agreements or waivers extending the statutory period of limitations applicable to any federal, state, county, city, local, or foreign tax return of Seller for any period.

4.5 **Financial Statements:** Seller will deliver to Purchaser its balance sheets and related statements of income for the years ended 2008, 2009 and 2010 and for the interim period ended July 31st, 2011. The Financial Statements fairly present the financial condition and results of operations of Seller as of the respective dates prepared in accordance with generally accepted accounting principles consistently applied throughout. The Financial Statements provide for all fixed and non-contingent liabilities of a type required to be disclosed or provided for in financial statements.

4.6 **Title to and Condition of Assets:** Seller has good, valid, and marketable title to all of the Acquired Assets except as set forth on **Schedule 4.6**, none of the Acquired Assets is subject to any imperfection in title, pledge, lien,

**Tab 7 Continued**

encumbrance, security interest, charge or other similar restriction of any nature whatsoever. Each of the Acquired Assets is in good operating condition and repair commensurate with its age and use, and capable of being used for its intended purpose in the ordinary course of business. All of the assets listed in Schedule 1.3(c) and 1.3(d) are located in the premises described thereon. Except as set forth on **Schedule 4.6**, no other person or entity has any rights to the use thereof and said assets are all the assets necessary to the conduct of the business of Seller. Except as set forth on **Schedule 4.6**, the patents, copyrights, trademarks, logo's and trade names set forth on Schedule 1.3(a) hereto are owned by Seller free and clear of all liens, charges, or encumbrances of any nature whatsoever without any material known conflict with the rights of others and the same are valid and enforceable and have been maintained and prosecuted by Seller.

4.7 **Litigation:** Except as set forth in **Schedule 4.7**, there is no action, suit, proceeding, or investigation pending or, to the knowledge of the Seller, threatened against or involving Seller before any court, administrative agency or other governmental body; and the Seller knows of any reasonable basis for any action, suit, proceeding, or investigation by any court, administrative agency, or other governmental body against or involving the Seller. No unsatisfied judgment, order, writ, injunction, decree or assessment or other command of any court or any federal, state, municipal, foreign, or other governmental department, commission, board, bureau, agency, or instrumentality has been entered against and served upon Seller. There is no action, proceeding or investigation pending, or to the knowledge of the Seller, threatened, which questions or challenges the validity of this Agreement or any of the transactions contemplated by this Agreement or otherwise seeks to prevent or have the effect of preventing the consummation of the transactions contemplated hereby.

4.8 **Insurance:** A description of all of the Seller's insurance, together with the limits of coverage, are set forth in **Schedule 4.8** attached hereto and made a part hereof.

4.9 **Employee Contracts:** The Seller has no obligations, contingent or otherwise, under any employment, consulting or similar agreement, collective bargaining agreement or other contract with a labor or employee group or under any executive or employee's compensation, life insurance, disability, medical, or other employee benefit plan or agreement, including, without limitation, any pension, profit sharing, stock purchase, stock option, bonus or savings plan or agreement, except as disclosed in **Schedule 1.3(b)** attached hereto and made a part hereof (the "Employee Contracts"). All contracts listed in **Schedule 1.3(b)** are valid and binding on all of the parties thereto, are in full force and effect and no party to any such contract is in default thereunder and, to the knowledge of the Seller, no default is threatened. **Schedule 1.3(b)** also sets forth the names, currently hourly and annual salary rates and other compensation arrangements of all employees of the Seller.

**Tab 7 Continued**

4.10 **Absence of Labor Difficulties:** There is no unfair labor practice charge or complaint against Seller pending before the National Labor Relations Board or any labor related agency. There is no strike, picketing, slowdown or work stoppage or organizational attempt actually pending or, to the knowledge of the Seller, threatened against or involving Seller. No representation question is pending or, to the knowledge of Seller is threatened respecting the employees of Seller. There is no collective bargaining or similar employee agreement, which is binding on the Seller or, to the knowledge of the Seller, is being asserted as binding by any person or entity on Seller. Seller has paid in full or accrued for all employees all wages, salaries, commissions, bonuses, and other direct compensation for services performed by them. Upon termination of the employment of any said employees, neither the Seller nor the Purchaser will, by reason of anything done prior to or at the Closing, be liable to any of said employees for so-called "severance pay" or any other similar payments, except as is set out in **Schedule 4.10**.

4.11 **Government Regulation; Compliance with Laws:** Except as set forth in **Schedule 4.7**, the Seller complies with, and the Seller has not received any notice of a failure to comply with, any statutes, laws, ordinances, rules, regulations, orders or directives applicable to the operations of the Seller. Seller has complied with all workers' compensation and unemployment compensation laws of the State of Pennsylvania and any other applicable jurisdiction, and has paid all premiums and amounts due thereunder. The Seller has all material permits, licenses, orders, approvals, authorizations, concessions and franchises of any governmental or regulatory authority that are necessary in the conduct of its business, all of which are set forth on **Schedule 4.11**.

4.12 **Operation in Ordinary Course of Business:** Since their inception, the businesses of Seller has been operated only in the ordinary course, and except as set forth on **Schedule 4.12**, there has not been to a material degree with respect to the Seller:

(a) Any adverse change in the aggregate in its condition (financial or otherwise), assets, liabilities, business, earnings or prospects;

(b) Any damage, destruction or loss in the aggregate adversely affecting its properties, business, or prospects, or any taking of or the creation of any immediate threat to take any real property owned or leased by the Seller by condemnation or eminent domain;

(c) Any forward purchase commitments in excess of the normal business requirements or other than for normal operating inventories or at prices higher than current market prices;

(d) Any increase in any rate or rates of salaries or compensation of salaried employees or agents, or any specific increases in the salary or compensation paid to or accrued for the benefit of any employee or agent or any increase in the

**Tab 7 Continued**

benefit payable under any bonus, insurance, pension or other benefit plan of the Seller;

(e) Any mortgage, pledge or subjection to lien, charge, security interest or to any other encumbrance of any of its assets or properties;

(f) Any waiver or release of any rights of material value;

(g) Any transfer or grant of any rights under any concessions, leases, licenses, agreements, patents, inventions, trademarks, trade names, service marks, copyrights or with respect to any know-how.

Seller will use its best efforts to continue to operate its business in the ordinary course from the date of execution hereof to the Closing Date.

4.13 **Completeness:** The Seller owns or has under lease or by contract all of the properties and assets, tangible and intangible, necessary in order to operate the business of the Seller as currently conducted with exceptions listed in **Schedule 4.13.**

4.14 **General Representation and Warranty:** None of the representations and warranties of the Seller made in this Agreement or in the Schedules of Exhibits contains any untrue statement of material fact or omits to state any material fact necessary in order to make said representations and warranties not misleading.

**5. Representations and Warranties of the Purchaser:** The Purchaser represents and warrants to the Seller as follows:

5.1 **Organization, Standing, and Power of Purchaser:** Purchaser is a corporation duly organized, validly existing and in good standing under the laws of the State of Pennsylvania. Purchaser is qualified and in good standing as a foreign corporation in all jurisdictions in which the failure so to be qualified would have a material adverse effect upon its business. Purchaser has the corporate power and corporate authority to hold, own, operate, and lease its properties and otherwise carry on its business as presently conducted.

5.2 **Authority:** The execution, delivery, and performance by Purchaser of this Agreement and all other agreements contemplated hereby have been duly and validly authorized by the Board of Directors of Purchaser and by all other necessary corporate action on the part of Purchaser, and, assuming due authorization, execution, and delivery by the other parties hereto and thereto, this Agreement and such other agreements constitute legal, valid, and binding agreements of Purchaser, enforceable against Purchaser in accordance with their terms, subject as to enforcement to applicable equitable principles and bankruptcy, insolvency, reorganization, moratorium, or other similar laws now or hereafter in effect generally affecting creditors rights.

5.3 **No Conflicts:** The execution, delivery, and performance of this Agreement

**Tab 7 Continued**

and the consummation of the transactions contemplated thereby by Purchaser have not and will not (i) violate, conflict with, or breach any provision of the Articles of Incorporation or Bylaws of Purchaser or any presently existing order, writ, injunction, judgment, decree, law, ordinance, rule, or regulation applicable to Purchaser or any of its properties, or (ii) violate, conflict with, require consent under, breach, cause a default, or provide grounds for termination, cancellation, or acceleration of performance in respect of, or result in the creation or imposition of a lien or other encumbrance Pursuant to, any agreement material to the business of Purchaser to which Purchaser is a party or to which it may be bound.

5.4 **Litigation:** Except as set forth in **Schedule 4.7** there is no action, proceeding or investigation pending or, to the knowledge of Purchaser, threatened which questions or challenges the validity of this Agreement or any of the transactions contemplated by this Agreement or otherwise seeks to prevent or have the effect of preventing the consummation of the transactions contemplated hereby.

## 6. Additional Agreements:

6.1 **Further Assurances:** After the Closing, the parties hereto agree to take whatever further action is necessary and to execute whatever further documents, instruments of assignment, transfer, conveyance or authorization and agreements as may be reasonably requested by the Purchaser in order to fulfill the purposes and the intent of this Agreement.

6.2 **Nondisclosure, Noncompetition and Noninterference:** The Seller shall: (i) at all times hold in strictest confidence any and all confidential nonpublic data and information within their knowledge concerning the products, services, businesses, representatives, suppliers, distributors, and customers of the business of the Seller; (ii) not, for a period of six (6) years after Closing Date, without the prior written consent of Purchaser, either directly or indirectly operate or perform any advisory or consulting services for, invest in or otherwise operate or become associated with in any capacity, any company, partnership, organization, proprietorship or other entity which competes with Purchaser in any geographic or product market in which Seller and/or Purchaser currently conduct business including each county in Pennsylvania and the remainder of Northern America; and (iii) not, at any time, without the prior written consent of Purchaser, directly or indirectly induce or attempt to induce any employee, agent or other representative or associate of the Purchaser to terminate its relationship with the Purchaser or in any way interfere with such a relationship or a relationship between the Purchaser and any of its suppliers, customers or distributors. Seller acknowledges that compliance with the covenants in this Section 6.2 is necessary to protect the Purchaser, and that a breach of these covenants will result in irreparable and continuing damage for which there will be no adequate remedy at law and agree that in the event of any breach of said covenants, Purchaser and its respective successors and assigns, shall be entitled to injunctive relief and to such other and further relief as is proper.

**Tab 7 Continued**

**7. Survival of Representations, Warranties and Indemnities:**

7.1 **Survival:** The representations, warranties and indemnities contained in this Agreement shall be deemed to be renewed at the Closing Date and shall survive the Closing.

7.2 **Representation and Warranty Indemnification by the Seller:** The Seller shall indemnify Purchaser against and hold it harmless from (i) any and all loss, damage, liability or deficiency resulting from or arising out of any inaccuracy in or breach of any representation, warranty, covenant, or obligation made or incurred by the indemnifying person herein; and (ii) any and all costs and expenses (including reasonable legal and accounting fees) related to any of the foregoing.

7.3 **Indemnification by Purchaser:** Purchaser shall indemnify Seller against and hold them harmless from (i) any and all loss, damage, liability or deficiency resulting from or arising out of any inaccuracy in or breach of any representation, warranty, covenant, or obligation made or incurred by Purchaser herein and (ii) any and all costs and expenses (including reasonable legal and accounting fees).

7.4 **Defense of Third Party Claims and Extension of Statute of Limitations:** The party to this Agreement against which a claim for an indemnification is asserted (the "Indemnifying Party") shall have a right in its discretion and at its expense to participate in and control (a) the defense or settlement of any claim, suit, action or proceeding (including appeals) in respect of such item (or items) by any other person other than a party hereto insofar as the Indemnified Party shall claim indemnification hereunder in respect thereof, (b) any and all negotiations with respect thereto and (c) the assertion of any claim against any insurer with respect thereto, and the Indemnified Party shall not settle any such claim, suit, action or proceeding or agree to extend any applicable statute of limitation without the prior written approval of the Indemnifying Party. The rights of participation, control and approval granted to the Indemnifying Party shall be subject to the following conditions precedent: (a) such party's acknowledging to the Indemnified Party, in writing, the obligation of the Indemnifying Party to indemnify the other party hereto in respect of such third party's claim, suit, action or proceeding giving rise to such item; and (b) the Indemnifying Party posting a bond or making other arrangements satisfactory to the Indemnified Party to assume full funding of the Indemnifying Party's obligation to indemnify the Indemnified Party as hereinabove provided. Upon satisfaction of such conditions precedent, the Indemnified Party will provide the Indemnifying Party with all reasonably available information, assistance and authority to enable the Indemnifying Party to effect such defense or settlement and upon the Indemnifying Party's payment of any amounts due in respect of such claim, suit, action or proceeding. The indemnified Party will, to the extent of such payment, assign or cause to be assigned to the Indemnifying Party the claims of the indemnified Party, if any, against such third parties in respect of which such payment is made.

**Tab 7 Continued**

If the Indemnifying Party is not so willing to acknowledge such obligation the parties shall jointly consult and proceed as to any such third party claim, suit, action or proceeding, but the Indemnified Party shall control the defense, negotiation or settlement thereof.

**8. Transition of Operations; Change of Name:** Seller agrees to assist Purchaser with the resolution of such transitional matters as may arise in connection with the consummation of the transactions contemplated hereby. Promptly following the Closing, the Seller agrees to change its corporate name and to execute such documents as shall be necessary for Purchaser to utilize its corporate name.

**9. Termination:** Purchaser may terminate this agreement if the Sellers Chapter 11 Cases are converted to cases under Chapter 7 of the Bankruptcy Code or a trustee is appointed under the Chapter 11 Cases.

In the event of a termination in accordance with this Section 9, and provided that each of Sellers and Purchaser have used their best efforts to effectuate a closing of the transactions contemplated hereunder, neither Sellers nor Purchaser shall suffer any liability or obligation to the other.

**10. No Third Party Beneficiaries:** This Agreement is solely for the benefit of the parties hereto and their respective affiliates and no provision of this Agreement shall be deemed to confer upon third parties any remedy, claim, liability, reimbursement, claim of action or other right in excess of those existing without reference to this Agreement.

**11. General Provisions:**

11.1 **Notices:** All notices and other communications given pursuant to this Agreement shall be deemed to have been properly given or delivered if hand delivered or if mailed, by certified mail, postage prepaid, addressed to the appropriate party, at the following addresses:

A. To the Seller:
Telatron Marketing Group, Inc.
1545 West 38th Street
Erie, PA 16508

And

B. To the Purchaser:
Veteran Call Center, LLC
200 Yoakum Parkway, Apt #301
Alexandria, VA 22304

**Tab 7 Continued**

With a copy to:

Kenneth Barton
9901 Durant Dr., Unit F
Beverly Hills, CA 90212

Any party may from time to time designate by written notice pursuant to this Section 9.1 any other address or party to which such notice or communication or copies thereof shall be sent.

11.2 **Brokerage Commissions and Fees:** Seller represents and warrants to Purchaser that no broker, finder or other person or entity acting in a similar capacity has participated on its behalf in bringing about the sale herein contemplated, rendered any services with respect thereto, or been involved in any way therewith.. Purchaser represents and warrants to Seller that other than as described on **Schedule 11.2**, no broker, finder or other person or entity acting in a similar capacity has participated on its behalf in bringing about the sale herein contemplated, rendered any services with respect thereto, or been involved in any way therewith. Purchaser shall be responsible for the Purchaser fees payable to the broker identified on **Schedule 11.2**.

11.3 **Capital Raising and Syndication Assistance:** Sellers acknowledges that Purchaser intends to raise capital from third parties to finance this transaction and Seller agrees to the terms in **Schedule 9.3**.

11.4 **Payment of Professional Fees and Other Expenses:** The professional fees of each party in connection with the transactions contemplated in this Agreement (including, but not limited to, legal and accounting fees) shall be borne by the respective parties incurring such fees.

11.5 **No Publicity:** Seller agrees that except for disclosures required by law, they shall not make any Public announcement or otherwise disclose the transaction contemplated hereby without the prior written consent of Purchaser.

11.6 **Miscellaneous:** This Agreement shall be construed in accordance with, and governed by, the internal domestic laws of the State of Pennsylvania applicable to contracts made and to be wholly performed within such State. This Agreement shall be binding upon and inure to the benefit of and be enforceable by the parties hereto and their respective successors and assigns. Headings and subheadings herein are for convenience only and are not of substantive effect. There are no oral agreements in connection with this Agreement. This Agreement constitutes the entire agreement of the parties hereto, and supersedes any prior agreements or understandings, whether oral or written, between the parties hereto with respect to the subject matter thereof. This Agreement may not be terminated, modified or amended orally or by any course of conduct or usage of trade but only by an agreement in writing duly executed

**Tab 7 Continued**

by the parties hereto. This Agreement may be executed simultaneously or in one or more counterparts, each of which shall be deemed an original and all of which together shall constitute one and the same instrument. Any waiver of a breach of any of the provisions of this Agreement shall not be deemed a waiver of any other provision of this Agreement. If any provision of this Agreement shall be determined to be unenforceable or invalid such provision shall remain in force and effect to the maximum extent allowable and the remainder of this Agreement shall be and remain binding and effective as against all parties hereto.

IN WITNESS WHEREOF, the parties have duly executed this Agreement as of the date first above written.

PURCHASER:

By:_____

Chairman & CEO
Veteran Call Center, LLC.


SELLER:
By:_____
President
Creditron Financial Corporation
dba Telatron Marketing Group, Inc.


By:_____
President
Boardwalk Business Square, Inc.


By:_____
Alfred D. Covatto

By:_____
Joyce M. Covatto

**Tab 7 Continued**

**Schedule 1.3(a)** - Telatron trade name and Logo

**Schedule 1.3(b)** –

**Schedule 1.3(c)** -

**Schedule 1.3(d)** –

Corporate offices including Real Property located at 1545 West 38th Street, Erie, PA 16508
Business furniture and furnishings located at 1545 West 38th Street, Erie, PA 16508
Business equipment including 500 Dell desktop computers located at 1545 West 38th Street, Erie, PA 16508

**Schedule 1.3(e)** - No change of control provisions in existing material contracts

**Schedule 1.4 – Secured Creditors List** (less amounts paid to date)
Internal Revenue Service:
$1,707,677.65 in employer's withholding tax
$672,428.59 in penalties
$179,386.29 in interest

Pennsylvania Department of Revenue:
$66,882.00 in corporate taxes
$1,045,640.90 in employer's withholding tax
$63,213.01 in sales and usage tax

City of Erie:
$377,285.00 employer's withholding tax

Dollar Bank:
$1,109,881.58 mortgage and business assets

Alfred D and Joyce M Covatto Internal Revenue Service personal lean
$870,461.00

**Unsecured Creditors List**

| | |
|---|---|
| Craig Markham | $5,863.97 |
| Delaware Marketing Group | $2,668,498.12 |
| Department of Revenue | $129,314.38 |
| Domino Insurance Agency | $4,869.21 |
| Health America PA, Inc. – PGH | $57,945.46 |
| Infinity CTI | $1,904.00 |
| National Fuel | $394.71 |

**Tab 7 Continued**

| | |
|---|---|
| Pitney Bowes | $57,339.76 |
| Pitney Bowes Credit Corp. | $6,926.10 |
| Pitney Bowes Purchase Power | $3,602.99 |
| Commonwealth of Pennsylvania | $25,594.00 |
| Qwest | $4,786.98 |
| UMPC | $29,219.73 |
| UPS | $140.62 |
| Verizon | $4,185.04 |
| Verizon Wireless | $1,507.39 |
| Verizon | $88.58 |
| Waste Management | $1,694.73 |

**Schedule 4.1 –**

State of Pennsylvania

**Schedule 4.3 –**

Creditron Financial Corporation is currently under Chapter 11 protection under Federal Bankruptcy Laws. There are various tax leans by tax authorities (see **schedule 1.4**).

Dollar Bank has secured mortgage and assets.

Delaware Marketing Group, Inc has a judgment against Creditron Financial Corporation.

**Schedule 4.4 –**

Internal Revenue Service:
$1,707,677.65 in employer's withholding tax
$672,428.59 in penalties
$179,386.29 in interest

Pennsylvania Department of Revenue:
$66,882.00 in corporate taxes
$1,045,640.90 in employer's withholding tax
$63,213.01 in sales and usage tax

City of Erie:
$377,285.00 employer's withholding tax

Dollar Bank:
$1,109,881.58 mortgage and business assets

Alfred D and Joyce M Covatto Internal Revenue Service personal lean

**Tab 7 Continued**

$870,461.00

## Schedule 4.6 –

Creditron Financial Corporation is currently under Chapter 11 protection under Federal Bankruptcy Laws.

Dollar Bank has secured mortgage and assets.

Delaware Marketing Group, Inc has a judgment against Creditron Financial Corporation.

## Schedule 4.7 –

Creditron Financial Corporation is currently under Chapter 11 protection under Federal Bankruptcy Laws.

Delaware Marketing Group, Inc has a judgment against Creditron Financial Corporation.

## Schedule 4.8 -

## Schedule 4.10 – Not Applicable

## Schedule 4.11 -

## Schedule 4.12 –

Creditron Financial Corporation is currently under Chapter 11 protection under Federal Bankruptcy Laws.

## Schedule 4.13 –

Creditron Financial Corporation is currently under Chapter 11 protection under Federal Bankruptcy Laws.

Dollar Bank has secured mortgage and assets.

## Schedule 11.2 - Tactilis Asset Management LLP

## Schedule 11.3 – Capital Raising and Syndication Assistance
The Purchaser intends to commence a capital raising transaction to raise debt and or equity funds to finance the acquisition of the company and satisfy certain current liabilities of the Company and its shareholders, promptly after Sellers

**Tab 7 Continued**

acceptance of the terms of this Purchase Agreement (the "Financing Transaction"). Sellers agree to assist the Purchaser and their designated financial advisor, Tactilis Asset Management LLP (the "Financial Advisor" or "Purchaser's Financial Advisor") in successfully achieving the Financing Transaction that is reasonably satisfactory to the Purchaser and its Financial Advisor, in consultation with Sellers. Such assistance shall include (a) Sellers providing and causing Sellers advisors to provide the Purchaser, its Financial Advisor and the Investors or Lenders with all information reasonably requested to complete such a transaction, (b) at the request of the Purchaser or its Financial Advisor, assisting in the preparation of a confidential information memorandum, including for equity and/or debt investors or lenders, and (c) otherwise assisting the Purchaser and its Financial Advisor in its capital raising and syndication efforts, including making Sellers officers and advisors available to make presentations regarding the business and prospects of the Company [(including the Telatron-VCC joint business plan)]; to participate in investor teleconference calls, video conference calls; make available to the Purchaser and its Financial Advisors the opportunity to hold investor meetings and investor due diligence sessions on site at the Company's main facilities in Erie PA (including arranging investor tours to view the operations of the Company), all as required to effect such a capital raising and financing transaction as determined in good faith by the Purchaser and its Financial Advisor.

It is understood by all parties that he Purchaser and its Financial Advisor will manage and control, in consultation with Sellers, all aspects of the capital raising and Financing Transaction, including decisions as to the selection of prospective investors and lenders, the terms and conditions of the transaction and associated debt or equity instruments, when commitments will be accepted, and other matters typically pertaining to a transaction or this nature.

**Information Requirements:** YSellers hereby represent and warrant that, to the best of Sellersr knowledge, (a) all written factual information, other than Financial Statements and Projections (each as defined below) and information of a general economic or industry nature, which has been or is hereafter made available to the Purchaser and its Financial Advisor and subsequently to any investor or lender by Sellers or any of Sellers' representatives (or on Sellers behalf) in connection with any aspect of the Financing Transaction (the "Information"), when taken as a whole, is, or will be when furnished, complete and correct in all material respects and does not, or will not, when furnished and taken as a whole, contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements contained therein not misleading; (b) all financial statements made available to the Purchaser and its Financial Advisor and any investors or lenders by Sellers or any of Sellers' representatives (or on Sellers behalf) in connection with the Financing Transaction (the Financial Statements) present fairly in all material respects the financial condition of the entities covered thereby as of the date thereof and the results of such entities operations for the periods indicated therein in accordance with GAAP and (c) all

**Tab 7 Continued**

financial projections concerning the company that have been or are hereafter made available to the Purchaser of its financial Advisor or the investors or lenders by Sellers or Sellers' representatives (or on Sellers behalf) (the "Projections") have been or will be prepared in good faith based on assumptions believed by Sellers to be reasonable at the time of preparation of such Projections; provided, however, although the projections are (or will be) necessarily presented with numerical specificity, the actual results achieved during the periods presented may differ from the projected results (and such differences may be material); and no representation can be, is being or will be given with respect to whether the Company or the Purchaser or the Company and the Purchaser together will achieve the results set forth in the Projections. Sellers agree to furnish Purchaser and Purchaser's Financial Advisor (and investors and lenders as the case may be) with such Information and Projections to supplement the Information, Financial Statements and the Projections from time to time until the closing of the Financing Transaction so that the representation and warranty in the immediately preceding sentence remains correct, taking into account any supplements to the Information and Projections delivered prior to the closing date of the Financing Transaction. In executing this Purchase Agreement entering into (or planning to enter into) the Financing Transaction, Sellers recognize and confirm that that Purchaser and Purchaser's Financial Advisor (a) are and will be using and relying on the Information, Financial Statements and the Projections without independent verification thereof, and (b) do not assume responsibility for the accuracy or completeness of the Information, Financial Statements and the Projections.

Sellers hereby acknowledge and agree that the Purchaser, its financial Advisor, and their agents may make available some or all of the Information, financial Statements, Projections and other marketing materials and presentations, including confidential information memoranda (collectively the "Information Materials"), to the potential lenders or investors either in physical form or by posting or transmitting the Information Materials via email, via a dedicated portal service, or by similar electronic means (collectively, the "Electronic Means").