IN THE UNITED STATES BANKRUPTCY COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | | |
|---|---|---|---|
| IN RE: | CREDITRON FINANCIAL CORPORATION<br>Debtor-in-Possession | : | CASE NO. 08-11289 |
| | ---------------------------------- | : | CHAPTER 11 |
| | CREDITRON FINANCIAL CORPORATION,<br>Movant | : | |
| | vs. | : | |
| | NO RESPONDENT | : | |

## RESPONSE TO EXAMINER'S REPORT

COMES NOW, the Debtor-in-Possession, by and through its counsel, SHAPIRA, HUTZELMAN, BERLIN, ELY, SMITH & WALSH, by STEPHEN H. HUTZELMAN, ESQUIRE and files this Response to Examiner's Report, a statement of which is as follows:

Attached hereto is a response to the Examiner's Report prepared by Debtor's Principal Joyce Covatto.

                                                                           Respectfully submitted,

                                                                           SHAPIRA, HUTZELMAN, BERLIN
                                                                           ELY, SMITH AND WALSH

                                                                           By: \s\ Stephen H. Hutzelman, Esq.
                                                                                305 West Sixth Street
                                                                                Erie, PA 16507
                                                                                Phone: (814) 452-6800
                                                                                Fax: (814) 456-2227
                                                                                E-mail: shutzelman@shapiralaw.com
                                                                                PA ID 06541

Date: December 22, 2010

1. On December 2, 2010 Federal Bankruptcy Judge Agresti, held a hearing to discuss the current status of the sale between the Veteran's Contact Center and Creditron Financial Corporation d/b/a Telatron. Marketing Group, Lac. Attorney Stephen Hutzelman, attorney for the Debtor-in-Possession.

2. The Court was highly concerned that the transaction was being delayed. The Court admonished Alfred D. Covatto and'Joyce Covatto and ordered that a special examiner be appointed. to assess the fallowing matters:

    a. The financial results of the Debtor since its filing date of July 3, 2008;
    b. The financial condition of the Debtor as of the date of the report to be filed;
    c. "1.he status of the trust fund taxes;
    d. The continued viability of the Debtor under any written or to be proposed plan of reorganization;
    e. The appointment of a Chapter 11 Trustee and impact on existing and new customer contracts;
    E Consideration of other relevant issues to be determined by the examiner; g.
A written recommendation to the Court for review and consideration.

3. On December 4, 2010, James A. Schaffner; CPA, a Principal of Schaffner, Knight, Minnaugh Company, PC was appointed by the Court.

4. On the afternoon of December 9, 2010, Mr. Schaffner communicated his report electronically to the Court.

s. On December i0. 2010. a ilea'l.:mg was held by the Honorable Court a„d Mr S:c4121Ther presented his review and recommendation.

6. In doing so, this Honorable Court relied on Mr. Schaffner's comments and observations, which the Debtor respectfully submits, were incomplete or in error, and, unless corrected, will formally and 'forever taint this company and its name.

Matron ha.s been working with Veteran Call Center, .111C (VCC) and. their financial advisors in a detailed financial due diligence analysis regarding an anticipated acquisition of Telatron or assets of Telatron. The findings of this due diligence support the position that the reports submitted. to the court and statements made by the court appointed accountant. examiner before the court indicate that the accountant examiner has developed. faulty and erroneous conclusion about the current financial condition of the company and its recent operating performance and trends.

Further, we believe that this has been instrumental in creating a false a. misleading impression before the court as to the current financial condition of the company and its near and medium term prospects. These financial analysis have been provided to the accountant examiner, with a request to discuss the same with the finance department of Telatron and VCC and their financial advisor. Simply put, the examiner has stated in no uncertain terms that the company has lost money in bankruptcy and its financial condition continues to deteriorate with. no recover in sight. This is manifestly incorrect and in fact the company as seen three successive quarters of operaoting profit, and it s recovery is clearly accelerating. We are at a total loss as to how he has come to derive his conclusions, and we question the diligence and substance of his review and

analysis given the facts we have observed. We would like to review the work product. on which he has based his financial analysis and that support the conclusions he has presented to this court, if indeed any meaningful financial analysis does even exist (or existed prior to his court submissions and statements). We would also like to understand the steps he undertook to interview the finance team at the company, depth of review of historical financial information, projected financial information and the scope, subject matter and depth of his other due diligence activities.

7. Mr Schaffner was asked to explain the major inconsistencies/inaccurate information contained in this report:. Individuals from the VCC as well as Telatron offered to meet with him, but the offers were refused.

We ask the court to reconsider the information developed over several months of du.e diligence by the VCC .This company who was/is seeking to acquire Telatron , by its very nature was looking for flaws in reports and profitability. They emerged from their findings to state that the company was profitable, and had a great future with help. And that they were anxious to buy it, save 400 jobs, and grow it.

The report by Mr SchalTher must be corrected. He was under oath when his testimony was provided to the court. The Honorable Court was Tint provided with neriimte. iriFormation.

With this information disclosed, we ask the court to allow further analysis to validate the company's profitability.


The following are statements the Honorable Court accepted as a true representation of the debtors' current state of condition:

A. The first statement provided by Mr. Schaffner the court relied upon: "the aggregate net loss for the period July 1, 2008 through October 31, 2010 which amounted to a net loss of Si 87,000. The report also states that sales steadily declined during the period. as did staff salaries. Officers' salaries, however, were at consistent levels throughout the period averaging approximately
5105,000 per month".

RESPONSE: The sales of Telatron started to decline in. December 2008 as a. result of the 2009/2010 recession. Several of their major clients were forced under the tarp and they reduced marketing budgets not only on acquisition, but on customer service type programs. In October 2010, volume was restored.

The appearance of a downward trend in sales is somewhat deceiving. While they did have less revenue in 2009 and 2010 as opposed to 2008, during the last three quarters sales have been

treading upward. The 4th quarter will represent about a 7% growth compared to the 4th quarter of 2009 and 34% as compared to the 1st quarter of 2010.

According to the forecast for 2011 (based. on. current contracts only) 1st quarter *sales* should show a 34% increase from 4Q 2008 and a 69% increase from Q1 2010. Total sales for 2011 should be about $14.3 million thereby exceeding sales of $13.8million shown in 2008. The company has during the past two years drastically reduced spending; operating income should be in excess of $2.4miilion with an MUM of $2.6million. (See exhibit A)

   B. Mr. Schaffner indicated in his written and verbal report that the corporation lost $187,000 since filing.

RESPONSE: What the report does not say is that the $187,000 loss considered deductions for depreciation of $539,271. Interest/Penalties of $107,682, Interest discount fees of $98,780, legal fees of $25,000 and payment to the trustee of $79,303. These expenses contributed to a final EBLIDA of about $643,574.

   C. The verbal and written report indicated that staff salaries decreased and officer's salaries remained at consistent levels. The impression given was that the typical staff employee was making less and that the officers were not affected by the Chapter 11 filing.

RESPONSE: This impression was absolutely untrue. Wages are paid by the company in accordance with a corporate policy involving eight wage levels. The same wages have been paid to these levels since the inception of the filing. Total wages for staff members were reduced as the volume of production hours decreased. It has nothing to do with how much people make. As for the officers, the current strategy is that because officers work 45 hours per week, in the event of a staff reduction, while they attempt to maintain an 11-1 supervision ratio they are able to utilize officers in lieu of 1.5 staff employee because of their experience. Officer's salaries have not increased in thr Cc years. (Set'. Pyllibit,

   D. Mr. Sella:11'11er presented his theory on the ghost children employees in his verbal and written report to the Court. His theory apparently was to paint the court a picture that showed reckless and self-serving financial management of the corporation. He chose the children of Alfred D. and Joyce M. Covatto as an example.

RESPONSE: However, he failed to do is his homework. There are three key management employees that operate three separate departments within the Telatron operation, He listed Andrea Covatto as making $47,000 per year. Andrea is a graduate of Penn State University where she majored in Human Resources. She is a Senior Vice President and has led the Human Resources area within the corporation for the past three years. She reports to Joseph DiFuccia; our Executive Vice President. While her income is $47,000, the position in the market place normally pays $105,000. She as the other adult children chooses to help the corporation by plowing her services into the company for the eventual financial welfare of the entity.

Renee Covatto Langdon is a Senior Vice .President and a graduate of Villanova. University where she graduated with honors. She has six credits to secure at Saint Joseph University where in April she will be receiving her master's degree in business administration/marketing. She currently is a senior Client Services person and coordinates major telemarketing programs as well as cu.stomer field visits. Her income is $53,248 per year and comparable jobs for a contact center pay $95,000 per year.

Tom. Covatto Laird makes $56,000 per year and his comparable position as Senior Vice President responsible for Production Management pays $100,000 per year. 'him has attended Allegheny College as well as Gannon University. He is responsible for the 375 plus people within the production staff. Each of these "ghost children" is well educated and they clearly command respect.

Joyce M. Covatto is paid $36,000 per year. Ha comparable salary in a contact. center environment is in excess of $250.000 plus bonuses. She is a graduate of Gannon University and has a national reputation for being well versed in contact center activity. Alfred D. Covatto is not a salaried employee of 'relatron.

Finally, a. family business normally employs family members. With the Telatron Covatto family, members execute MBO's that are normally more difficult than others and they are expected to achieve higher than normal results;

E. Mr. Sella ft Rmr indicated that there was a. fictitious amount listed under "other current assets" for Intangible Assets.

R l'iSPONSE.'.; this entry is shown on normal Comparative Statement after Fixed Assets in. a heading called OTHER ASSETS. When the report was initially prepared, the staff accountant erred and instead of listing it under OTHER ASSETS, he listed. it unintentionally under OTHER CURRENT ASSETS. EaCh month. thereafter, it was listed in the same spot. Had a reviewer brought this to our attention bet             the error would have been corrected, as anyone familiar with financial statements understands a heading of "Intangible Assets" and where it should be identified. This was simply an. unintentional error.

Mr. Schaffner was quick to point out in his discussion with us when he was here about the quality of Other Assets. We pointed. out to him that the intangible assets listed are those assets that we consider not physical, Also. our $^{attorney}$ at the same meeting indicated to him that when we filed other documentation in this Chapter 1.1 process, we indicated that this asset was our opinion of the value of such things as intellectual property, programs that were developed etc. That they may or may not have a value depending on the reviewer.

Mr. Sch.aftner's observation appeared that he was communicating to the court that they attempted to deceive the reviewer. He apparently did not review other filings which would have given him the proper answer.

F. Another accusation within his written and verbal report was that the rental monies paid for the facilities appeared to be a method. of moving funds from the company into personal worth.

RESPONSE: A memo to Mr. Schaffner, along with copies of the leases. Overall, Telatron utilizes 36,875 square feet of the buildings within the 'Boardwalk 'facility, and pays a total of $477,784 annually including taxes. The cost per s/f (including taxes) is about $1.1.33. This s/f price is consistent with the market and lower than the $14.73 s/f being paid by the county for 1,980square feet in the same facility. Sammartino & Stout Inc. (MAI /SRA appraisers indicated in 2007 that the county price per s/f was "at or near market rent".

Additionally, as we shared with .Mr. Schaffner, because Telatron was unable to borrow funds, Alfred D. and Joyce M. Covatto borrowed personally and loaned the funds to the corporation. At the time of the filing, the corporation. owed the Covatto's $437,922 on the initial loan as well as a loan used to pay the IRS for Sub-Chapter S taxes due of about $650,000. (They pledged. their

home real property as collateral on the loan which paid IRS), payment now is $7,500 a month). Because the corporation lost its American Fxpress credit card upon filing, they have used their personal credit cards to purchase supplies and equipment. for Telatron. This has brought their approved line of credits on their cards to maximum and it will cost them about $6,500 per month to finally decrease the balances involved. This then leaves them with personal expenses including educational expenses of $2,000 per month plus medical expenses for Mr. Covatto's illness. The IR.S recently levied on Mrs. Covatto's wages and Mr. Covatto's social security check. You can see various payments made to Boardwalk by Telatron throughout a month

because it had limited to cash flow. In some months cash flow is better than other months and for that reason there may be higher payments in one month and in others not so much. Finally, at the time of the filing, Telatron owed about $315,000 to Boardwalk. Mr. Schaffner indicates that we have not shown "good faith" by reducing the rental or our wages. Of course, he is incorrect.

G. Mr. Schaffner discusses the tax deposits that are currently owing by Telatron to the tax authorities.

RESPONSE: The majority of the Post-Filing tax deposits owing shall he eliminated with the next week. and any balance remaining shall be paid by January 15, 2011. Since the corporation is making weekly tax deposits, the accumulative balance of post-filing taxes owing will be fully extinguished. (During the past two years, the corporation has paid about $300,000 in pre-filing taxes owing). Their monthly revenues are now increasing and. the corporation is now in position to make timely payments on taxes as it did previously demonstrated during the first two years of the Chapter 11 status.

8. Any assumption that the Covatto's have an excessive life style is incorrect.
They do not have thousands of dollars stashed away and because of the Courts directive to eliminate further rental lease payments; the Court has limited them to an existence where they cannon pay their fixed obligations which cease from injecting funds into the business. They are now listing their home which they can no longer afford and they intend to payoff the mortgage so that the financial organization involved can be protected.

9. The Honorable Court has been disturbed because the transaction between Telatron and VCC had been promised to take place earlier. It was not the intent of the Covatto's to delay the transaction in any way. The issues had been agreed upon until today and the VCC and. Telatron are moving rapidly to complete the transaction.

10. The Court has added a. financial burden to the corporation because of the inaccurate and unchallenged information that it has received. First, at the December 2nd hearing, we erred by not sharing with the Honorable Court that. tax payments were being paid. current, including the Unemployment Compensation unpaid Ta.x alleged by the Commonwealth. That, of course, was paid and it merely needed to be said in court. Furthermore, the attorney for Telatron had insufficient time between. the times Mr. Schaffner's written report was presented to the time of the hearing. As a result, the information. that. Mr. Schaffner presented could not be verified in time by our attorney so that he could properly question Mr. Schaffner relative to his findings. The Court as well as other participants at the hearing would have only assumed that Mr. Schaffner's conclusions were accurate instead of being inaccurate and misleading.

11. The VCC's Investment Banking Group made an examination of Telatron's operating results as part of their Due Diligence proceedings. Their conclusions were different than the conclusions presented. by Mr. Schaffner, where he states that "In the twenty eight month period ended October 31, 2010, they were unable to and did not earn a profit, obtain a loan,

attract an investor or find a. buyer". The VCC's investment Banker had other thoughts after completing a comprehensive review. In short, their analysis indicated that the business has improved meaningfully in 2010 and in particular has improved strongly in 4Q 20:10. They state in an email to James Schaffner "As you can see the year started out in loss (Q1), but delivered three quarters of successive operating profit, with a. particularly strong fourth. quarter". They provided the data to him on their conclusions and asked him why he may have developed differing conclusions. (See exhibit C)

Telatron also reached out to Mr. SchafTher to provide him with any other information he may have wished to review / Mr. Schaffner declined their offer to Ken Barton from the VCC.

The Honorable Court had received a purchase agreement: on Monday December 20, 2010 (since withdrawn) signed by both. the VCC and the owners of the corporation. Telatron understands that although it is currently in a profit mode, that realistically it is best for the corporation, its creditors and its employees to stand aside and allow a sale to take place.Therefore, the sale of this corporation will be advantageous to the community as well as to all concerned.

The Court received a report from James Schaffner regarding the financial condition of Telatron. Unfortunately, this report included inaccurate and misleading information along with a conflicting financial analysis that was presented. to the Court. Telatron has been a loyal member of the Erie 'Business community for twenty five years. It has encountered a number of industry economic barriers as well as the 2009-2010 recessions. It has hired educated and trained thousands of individuals who were then able to utilize their relationships and compensation with 'Telatron to improve their lives. The Covatto's were never the enemies of Erie business as

depicted. in the news media. Instead, they are and they have been contributors to the people of the cornmunity.

It is in the interest of the Debtor, its employees, its creditors, and the community of Erie that this business with nearly 400 employees be preserved as an entity with a going concern value rather than having its furniture and computers liquidated at a nominal value. The cost to the Commonwealth in Unemployment Compensation to displaced workers is far greater than the cost of allowing this business to continue as an operating entity.

Listed below are the incomes as well as the EB1DTA. for the first quarter of 2011. These are the numbers which can be achieved from contacts that we have been able to secure, and volume we have been training for in the past few months.

We probably have not done as good of a job as we should have communicating with the court, but we have been busy going .forward.

The below are projected and achievable numbers per contracts secured:

- If the company is not converted to chapter 7. (The economic impact on. Erie would be in excess of $17,000,000)
- our profitability will increase
- our cash flow will remain positive
- and we are able to continue to work for an up flow of business

Projections for the first quarter of 2011 are generated from contacts that we have for present programs (attachment F)

= The new income for the first quarter will be $554,878.415 or an EBITDA of $745,485.S I
- The EBIDTA for 2010 is projected to be $120,298.92 for the year

Attached. in exhibit is also the cash flow for the first quarter of 2011.
Num.bers have been validated thru ACCEPTH) accounting practices.

I hope you can see that the company does once again have great opportunity to add to the economic climate of Erie.

I am sorry we have been in chapter 11 so long. We tried our best to pull it thru, but with illness and the economy, it has just taken us longer to recover.


Thank you,

'Joyce Sarbak Covatto

TELATRON MARKETING GROUP, INC.
QUARTERLY RESULTS

| | 4Q 2009 | 1Q 2010 | 2Q 2010 | 3Q 2010 | E4Q 2010 |
|---|---|---|---|---|---|
| **Income** | | | | | |
| MISC-111 | 6,026.32 | 127.50 | 66,358.06 | 0.00 | 9,360.00 |
| B-103 | 1,764,012.79 | 1,382,968.21 | 1,461,622.48 | 1,482,241.67 | 1,884,478.61 |
| V-110 | 12,823.53 | 14,306.55 | 17,570.42 | 15,710.69 | 8,355.79 |
| FC-132 | 0.00 | 0.00 | 0.00 | 0.00 | 18,700.00 |
| N-128 | 0.00 | 25,180.00 | 0.00 | 0.00 | 17,507.12 |
| F-131 | 0.00 | 0.00 | 19,010.98 | 0.00 | 0.00 |
| U-109 | 65,837.30 | 66,889.34 | 35,376.79 | 0.00 | 0.00 |
| M-104A | 265,307.80 | 215,602.52 | 289,813.27 | 413,913.50 | 324,539.52 |
| SF-106A | 216,053.08 | 192,375.41 | 201,636.97 | 163,049.83 | 201,586.22 |
| SF-106B | 0.00 | 2,100.00 | 13,778.48 | 0.00 | 0.00 |
| LH-115 | 186.16 | 33.01 | 369.22 | 334.21 | 284.14 |
| NF-116A | 4,387.38 | 3,497.82 | 3,097.26 | 3,265.98 | 3,395.76 |
| NF-116B | 41,999.39 | 35,384.47 | 28,791.63 | 25,957.38 | 25,259.93 |
| PW-117 | 153.47 | 0.00 | 783.07 | 920.67 | 504.90 |
| P-118 | 4,500.17 | 4,126.28 | 9,709.43 | (2,078.92) | 2,850.54 |
| MK-120 | 10,052.92 | 5,370.93 | 5,018.99 | 6,744.13 | 7,123.99 |
| O-122 | 85,022.79 | 24,038.48 | 156,872.76 | 170,229.39 | 122,936.35 |
| GC-123 | 542.25 | 406.74 | 261.84 | 178.95 | 185.42 |
| T-128 | 7,972.80 | 2,213.11 | 4,381.59 | 2,245.83 | 10,828.70 |
| F-133 | | | | | 17,637.30 |
| EN 129 | 5,340.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| KD-130 | 0.00 | 1,600.00 | 2,700.00 | 5,466.68 | 0.00 |
| **TOTAL Income** | 2,491,218.15 | 1,976,220.37 | 2,317,551.04 | 2,288,180.19 | 2,655,365.29 |
| Gross Profit | 2,491,218.15 | 1,976,220.37 | 2,317,551.04 | 2,288,180.19 | 2,655,355.29 |
| **Operating Expenses** | | | | | |
| OFFICER'S SALARIES | 326,410.84 | 282,061.07 | 323,781.44 | 317,627.59 | 317,627.59 |
| STAFF SALARIES | 1,546,232.22 | 1,279,692.41 | 1,315,796.87 | 1,370,090.33 | 1,556,038.20 |
| EMPLOYER FICA | 141,098.99 | 120,212.63 | 108,164.74 | 125,836.79 | 142,867.83 |
| EMPLOYER FUTA | 3,980.01 | 10,348.40 | 5,478.46 | 3,304.11 | 3,769.92 |
| WORKERS' COMPENSATION INS | 441.45 | 12,597.24 | 12,597.24 | 12,597.24 | 12,597.24 |
| HEALTH INSURANCE | 33,066.28 | 23,544.69 | 34,311.30 | 30,734.66 | 30,734.66 |
| LIFE AND DISABILITY | 4,737.73 | 5,829.40 | 6,269.33 | 6,696.64 | 6,696.64 |
| PROPERTY TAXES | 7,500.60 | 7,275.00 | 7,275.00 | 7,275.00 | 7,275.00 |
| DEPRECIATION | 43,958.84 | 45,457.63 | 45,458.07 | 24,495.53 | 24,495.53 |
| BUSINESS DEVELOPMENT | 4,661.20 | 5,303.87 | 5,759.59 | 5,577.21 | 5,577.21 |
| PUBLICATIONS/SUBSCRIPTIONS | 5,075.01 | 4,249.58 | 9,059.37 | 6,144.74 | 6,144.74 |
| DUES/MEMBERSHIPS | 720.93 | 409.95 | 140.00 | 140.00 | 140.00 |
| TRUSTEE FEES | 9,753.36 | 9,750.00 | 9,750.00 | 9,750.00 | 9,750.00 |
| LEGAL FEES | 0.00 | 0.00 | 7,604.64 | 328.50 | 328.50 |
| CONSULTING FEES | 3,192.00 | 5,188.00 | 4,788.00 | 5,276.00 | 5,276.00 |
| EQUIPMENT MAINTENANCE | 15,361.79 | 1,084.55 | 159.00 | 5,193.14 | 5,193.14 |
| EQUIPMENT RENTAL | 2,121.97 | 3,812.40 | 5,470.90 | 3,941.22 | 3,941.22 |
| STATIONERY/FORMS | 0.00 | 170.61 | 0.00 | 181.60 | 181.60 |
| SOFTWARE EXPENSE | 2,467.14 | 907.85 | 3,838.05 | 3,189.58 | 3,189.58 |
| POSTAGE | 17,701.84 | 15,756.05 | 18,428.39 | 13,343.58 | 13,343.58 |
| COURIER | 1,929.65 | 2,145.49 | 1,906.45 | 1,579.64 | 1,579.64 |
| FLOWERS/GIFTS | 4,875.82 | 160.76 | 0.00 | 118.72 | 118.72 |
| TRAVEL | 1,272.36 | 187.78 | 334.75 | 3,146.44 | 1,282.99 |
| MEALS - TRAVELER | 271.38 | 0.00 | 0.00 | 93.93 | 93.93 |
| ADVERTISING | 3,780.13 | 950.69 | 3,950.01 | 656.43 | 950.69 |
| OFFICE/STORAGE RENTAL | 104,731.50 | 105,565.50 | 104,630.25 | 104,562.00 | 104,562.00 |
| SECURITY SERVICE | 2,206.96 | 1,863.10 | 1,976.96 | 2,053.27 | 2,053.27 |
| CLEANING SERVICE | 435.66 | 714.33 | 435.66 | 439.90 | 439.90 |
| CLEANING SUPPLIES | 10,974.38 | 11,042.09 | 9,147.13 | 10,917.84 | 10,917.84 |
| AUTO RENTAL/LEASE | 242.42 | 0.00 | 254.05 | 869.52 | 869.52 |
| OTHER AUTO EXPENSE | 1,084.60 | 64.78 | 1,577.65 | 82.00 | 82.00 |
| AUTO MILEAGE/GAS | 2,348.79 | 101.52 | 1,092.15 | 1,051.20 | 1,051.20 |
| AUTO INSURANCE | 1,318.18 | 1,977.24 | 1,977.24 | 1,977.24 | 1,977.24 |
| MAINTENANCE/REPAIRS | 13,098.04 | 4,586.22 | 2,597.88 | 10,852.72 | 4,586.22 |
| PAYROLL PROCESSING | 7,114.00 | 2,094.70 | 5,082.85 | 4,483.75 | 5,082.85 |
| INSURANCE EXPENSE | 12,898.40 | 14,778.48 | 12,908.20 | 14,622.57 | 14,622.57 |
| INTEREST EXPENSE | 11,255.50 | 11,345.26 | 11,827.99 | 7,842.48 | 7,842.48 |
| BANK SERVICE CHARGES | 3,440.71 | 7,285.74 | 3,261.08 | 3,451.53 | 3,451.53 |
| OTHER SERVICE CHARGES | 6,758.53 | 5,553.98 | 7,566.81 | 10,091.97 | 10,091.97 |
| COMPUTER SUPPLIES EXPENSE | 0.00 | 881.31 | 0.00 | 0.00 | 0.00 |
| UNEMPLOYMENT COMPENSATION TAX | 27,462.86 | 71,512.44 | 42,489.01 | 24,788.69 | 27,732.63 |
| EMPLOYEE INCENTIVES | 9,144.93 | 8,072.23 | 6,513.42 | 9,466.67 | 9,466.67 |
| CLOTHING/UNIFORM EXPENSE | 0.00 | 141.94 | 442.65 | 35.00 | 35.00 |
| EQUIPMENT EXPENSE | 4,759.02 | 6,982.34 | 2,870.23 | 3,162.53 | 3,162.53 |
| EMPLOYEE FOOD/BEVERAGE ACCOUNT | 3,482.58 | 719.49 | 1,317.87 | 2,917.00 | 2,917.00 |
| TRAINING/EDUCATION EXPENSE | 489.57 | 89.00 | 338.00 | 112.50 | 112.50 |
| SUPPLIES EXPENSE | 29,818.75 | 24,136.91 | 26,736.16 | 29,779.61 | 29,779.61 |
| UTILITIES-WATER & SEWER | 1,129.15 | 1,448.28 | 973.10 | 1,459.04 | 1,459.04 |
| UTILITIES - NATURAL GAS | 1,560.49 | 7,240.34 | 3,703.14 | 781.41 | 7,240.34 |
| UTILITIES - ELECTRIC | 29,252.82 | 27,212.10 | 29,416.53 | 34,665.20 | 34,665.20 |
| WASTE REMOVAL | 4,855.25 | 5,100.49 | 5,489.71 | 5,478.69 | 5,478.69 |
| TELEPHONE - AT&T | 25,171.44 | 22,917.16 | 13,755.93 | 9,666.16 | 9,666.16 |
| TELEPHONE - GTE | 0.00 | 17,382.88 | (17,382.88) | 0.00 | 0.00 |
| TELEPHONE - QWEST | 19,850.98 | 0.00 | 41,013.41 | 22,139.25 | 22,139.25 |
| PENALTIES - FEDERAL | 356.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| TELEPHONE EXPENSE | 43,927.69 | 27,715.25 | 41,754.08 | 26,492.97 | 26,492.97 |
| **TOTAL Operating Expenses** | 2,559,985.83 | 2,226,254.15 | 2,294,187.96 | 2,301,543.33 | 2,507,092.33 |
| Net Income from Operations | (68,767.68) | (250,033.78) | 23,363.08 | (13,363.14) | 148,262.96 |
| Earnings before Income Tax | (68,767.68) | (250,033.78) | 23,363.08 | (13,363.14) | 148,262.96 |
| Net Income (Loss) | (68,767.68) | (250,033.78) | 23,363.08 | (13,363.14) | 148,262.96 |
| **EBITDA Add Ins** | | | | | |
| DEPRECIATION | 43,958.84 | 45,457.63 | 45,458.07 | 24,495.53 | 24,495.53 |
| INTEREST AND PENALTIES | 11,611.50 | 11,345.26 | 11,827.99 | 7,842.48 | 7,842.48 |
| INTEREST DISCOUNT FEES | 6,758.53 | 5,553.98 | 7,566.91 | 10,091.97 | 10,091.97 |
| EBITDA | (6,428.81) | (187,676.91) | 88,216.05 | 29,066.84 | 190,692.94 |

## TELATRON MARKETING GROUP, INC.
## QUARTERLY RESULTS

|  | E4Q 2010 | E1Q 2011 |
|---|---:|---:|
| TOTAL Income | 2,655,355.29 | 3,341,198.00 |
| Gross Profit | 2,655,355.29 | 3,341,198.00 |
| Operating Expenses |  |  |
| WAGES & SALARIES | 1,873,665.79 | 2,140,705.56 |
| PAYROLL RELATED | 224,332.85 | 221,187.31 |
| TELEPHONE | 58,298.38 | 79,186.39 |
| RENT | 104,562.00 | 119,768.70 |
| STATIONARY and SUPPLIES | 29,941.21 | 16,037.75 |
| POSTAGE and COURIER | 14,923.22 | 6,976.82 |
| ADVERTISING | 950.69 | 3,341.20 |
| DEPRECIATION | 24,495.53 | 26,511.91 |
| INSURANCE EXPENSE | 29,197.05 | 15,581.56 |
| BUSINESS DEVELOPMENT | 5,577.21 | 6,682.40 |
| PROFESSIONAL FEES | 5,604.50 | 3,675.32 |
| MAINTENANCE/REPAIRS | 4,586.22 | 6,682.40 |
| CLEANING EXPENSE | 10,917.84 | 8,353.00 |
| OTHER | 120,039.84 | 131,629.29 |
| TOTAL Operating Expenses | 2,507,092.33 | 2,786,319.59 |
| Net Income from Operations | 148,262.96 | 554,878.41 |
| Earnings before Income Tax | 148,262.96 | 554,878.41 |
| Net Income (Loss) | 148,262.96 | 554,878.41 |
| EBITDA Add Ins | 42,429.98 | 190,607.40 |
| EBITDA | 190,692.94 | 745,485.81 |

## TELATRON MARKETING GROUP, INC.

|  | 2011 PROJECTED |
|---|---:|
| TOTAL Income | 14,367,188.45 |
| Gross Profit | 14,367,188.45 |
| Operating Expenses | |
| WAGES & SALARIES | 9,204,428.00 |
| PAYROLL RELATED | 951,450.80 |
| TELEPHONE | 340,497.90 |
| RENT | 514,548.00 |
| STATIONARY and SUPPLIES | 68,961.60 |
| POSTAGE and COURIER | 30,170.70 |
| ADVERTISING | 14,367.00 |
| DEPRECIATION | 114,000.00 |
| INSURANCE EXPENSE | 67,023.00 |
| BUSINESS DEVELOPMENT | 28,734.00 |
| PROFESSIONAL FEES | 15,803.70 |
| MAINTENANCE/REPAIRS | 28,734.00 |
| CLEANING EXPENSE | 35,917.50 |
| OTHER | 566,090.89 |
| TOTAL Operating Expenses | 11,980,727.09 |
| Net Income from Operations | 2,386,461.36 |
| Earnings before Income Tax | 2,386,461.36 |
| Net Income (Loss) | 2,386,461.36 |
| EBITDA Add Ins | 190,607.40 |
| EBITDA | 2,577,068.76 |

# Telatron Organizational Pay Levels



| | Low | Mid | High |
|---|---|---|---|
| ◆— Level 1 | 90,000 | 150,000 | 250,000 |
| ■— Level 2 | 50,000 | 90,000 | 150,000 |
| Level 2.5 | 40,000 | 80,000 | 90,000 |
| ✕— Level 3 | 35,000 | 60,000 | 80,000 |
| ✳— Level 4 | 32,000 | 44,000 | 60,000 |
| ●— Level 5 | 20,000 | 38,000 | 44,000 |
| +— Level 6 | 16,000 | 27,000 | 38,000 |
| —— Level 7 | 15,000 | 18,000 | 27,000 |
| Level 8 | 15,000 | 17,000 | 26,000 |

## Hourly Wage Conversion Schedule

| | | | |
|---|---|---|---|
| $7.25 | $15,080 | $11.00 | $22,880 |
| 7.50 | 15,600 | 11.50 | 23,920 |
| 8.00 | 16,640 | 12.00 | 24,960 |
| 8.50 | 17,680 | 12.50 | 26,000 |
| 9.00 | 18,720 | 13.00 | 27,040 |
| 9.50 | 19,760 | 13.50 | 28,080 |
| 10.00 | 20,800 | 14.00 | 29,120 |

# Telatron Organizational Pay Levels



Jim,

I hope this email finds you well. In keeping with the agreement to keep you informed of the VCC analysis and due diligence process and work that relates to the underlying rationale and basis for the VCC purchase agreement and proposed creditor repayment plan, I wanted to provide you with the outputs of the financial modeling and analysis that we have been preparing with the assistance of the Telatron finance team as part of our due diligence activities.

These analyses focus on operating profit generation and the historical and current financial performance and recent operating trends. Specifically, the analyses cover/comprise:

1. Historical performance vs. projected 2011 performance based on certain assumptions and sensitivities on a quarterly basis and an annual basis;

2. I have attached seven PDF files, three that outline scenarios for the period Projected Q1 2011, and three files showing annual historical 2008 through 2010 (last quarter 2010 projected) and projected annual scenarios for 2011 based on three different revenue assumptions.

3. For your convenience, we have had them cut and pasted into a PDF document for ease in opening and printing

4. The seventh file is a quarterly analysis that compares operating performance on a quarterly basis for the periods Q4 2009, Q1 2010, Q2 2010, Q3 2010 and ProjQ4 2010 (part projected/estimated). It shows significant improvement in the current quarter, and obvious positive business momentum that appears to be accelerating. I think it would be worth your while to sit down with the Telatron team to understand fully the operating performance of the business in Q4 2010, the underlying customer contracts and business flows that are driving operating performance, and the implications for Q1 2011 and annual 2011.

5. Our analysis indicates that the business has improved meaningfully in 2010, and in particular has improved strongly in 4Q 2010. As you can see the year started out in loss (Q1), abut delivered three quarters of successive operating profit, with a particularly strong fourth quarter.

6. It seems apparent from our analysis that on an annualized basis, the business will perform even better next year, based on current contracted levels (see attached relevant files - Conservative Growth 2008 to 2011) and given the reduction / removal in rental expense to Boardwalk as contemplated under our purchase plan (and as reflected in the in-place court orders regarding payments to Boardwalk).

7. We wanted to understand if your own investigations into the current financial profile of the company have come to the same conclusions that VCC has (and if so, have you informed the court and Judge Agresti of this). If not, we want to understand how; and why you might have developed differing conclusions from VCC, namely that:

A. 2010 operating performance is stronger than 2009. Based on our updates for 4Q2010 (prepared this morning), our attached analysis slightly understates the operating performance for Projected Annual 2010 by some $20-30 thousand (EBITDA).

B. Q4 2010 is performing at a run rate in excess of the prior three quarters based on current accounts and actual customer billings, and substantially in excess of 4Q09 and 1Q 2010.

C. Q1 2011 should be reasonably assumed to outperform Q4 2010 based on in place contracts, rental adjustments, and there are additional customer contracts expected to be signed in January 2011 which cold increase that further.

D. the annual period 2011 will show a more meaningful operating profit based on current contracted levels and customer billings, which is increased to a 'comfortable sustainable' operating profit once the reduction in the rent (as mandated by the court and incorporated into our Purchase agreement and creditor plan) is taken into account, ignoring any meaningful new customer business flows. Or conservative case estimated 2011 EBITDA of approximately $1.8m.

E. There does not seem to be any reason to have a significant or high degree of concern that there will be an operating cash flow deficit for the period 1Q 2011, based on current customer billings/contracts in place, the court mandated reduction in rental expense and even less so if one considers the potential contracts from existing and new clients that have indicated they would like to contract for additional business in January 2011.

7. We want to ensure that you have every opportunity to review these materials with the Telatron finance team and senior management, so that your report to the court and Judge Agresti can reflect the current performance of the company.

8. I would like to have the opportunity to discuss these analyses with you later today, and would encourage you to meet with the Telatron finance team later today to discuss the in place customer contracts, and the quantum of revenues be invoiced in the current customer billing cycle (December) so that you can have a more exact view on the in-place business flows / current run rate, which will largely drive Q1 2011 operating results under a conservative case projection scenario, and that have underpinned the strong recent operating performance.

Joyce, Mark - please confirm by return email to all parties when you would be available to meet with Jim this afternoon to discuss the current customer contract levels/billing volumes that underpin the Q1 2011 and Annual 2011 Conservative Case projections.

Kind regards,

Tom Burke

## TELATRON MARKETING GROUP, INC.
## QUARTERLY RESULTS

|  | E4Q 2010 | E1Q 2011 |
|---|---:|---:|
| TOTAL Income | 2,655,355.29 | 3,341,198.00 |
| Gross Profit | 2,655,355.29 | 3,341,198.00 |
| Operating Expenses |  |  |
| WAGES & SALARIES | 1,873,665.79 | 2,140,705.56 |
| PAYROLL RELATED | 224,332.85 | 221,187.31 |
| TELEPHONE | 58,298.38 | 79,186.39 |
| RENT | 104,562.00 | 119,768.70 |
| STATIONARY and SUPPLIES | 29,941.21 | 16,037.75 |
| POSTAGE and COURIER | 14,923.22 | 6,976.82 |
| ADVERTISING | 950.69 | 3,341.20 |
| DEPRECIATION | 24,495.53 | 26,511.91 |
| INSURANCE EXPENSE | 29,197.05 | 15,581.56 |
| BUSINESS DEVELOPMENT | 5,577.21 | 6,682.40 |
| PROFESSIONAL FEES | 5,604.50 | 3,675.32 |
| MAINTENANCE/REPAIRS | 4,586.22 | 6,682.40 |
| CLEANING EXPENSE | 10,917.84 | 8,353.00 |
| OTHER | 120,039.84 | 131,629.29 |
| TOTAL Operating Expenses | 2,507,092.33 | 2,786,319.59 |
| Net Income from Operations | 148,262.96 | 554,878.41 |
| Earnings before Income Tax | 148,262.96 | 554,878.41 |
| Net Income (Loss) | 148,262.96 | 554,878.41 |
| EBITDA Add Ins | 42,429.98 | 190,607.40 |
| EBITDA | 190,692.94 | 745,485.81 |

## TELATRON MARKETING GROUP, INC.
## PROJECTED CASH FLOW 1ST QUARTER 2011

|                          | January    | February    | March       |
|--------------------------|-----------:|------------:|------------:|
| **Beginning Cash**       | 183,456.80 | 252,701.54  | 379,940.64  |
| **Cash Receipts**        |            |             |             |
| MISC-111                 | 3,120.00   | 4,804.67    | 4,804.67    |
| B-103                    | 789,737.92 | 751,296.00  | 751,296.00  |
| V-110                    | 2,788.93   | 5,214.00    | 5,214.00    |
| F-131                    | -          | 42,500.00   | 42,500.00   |
| M-104A                   | 50,490.00  | 100,980.00  | 100,980.00  |
| SF-106A                  | 79,053.00  | 79,053.00   | 79,053.00   |
| NF-116A                  | 9,551.90   | 13,327.33   | 13,327.33   |
| **Total Cash Receipts**  | 984,741.75 | 1,047,175.00 | 1,047,175.00 |
| **Cash Payments**        |            |             |             |
| WAGES & SALARIES         | 713,568.52 | 713,568.52  | 713,568.52  |
| PAYROLL RELATED          | 73,729.10  | 73,729.10   | 73,729.10   |
| TELEPHONE                | 19,432.79  | 26,395.46   | 26,395.46   |
| RENT                     | 34,854.00  | 39,922.90   | 39,922.90   |
| STATIONARY and SUPPLIES  | 9,980.40   | 5,345.92    | 5,345.92    |
| POSTAGE and COURIER      | 4,974.41   | 2,325.61    | 2,325.61    |
| ADVERTISING              | 316.90     | 1,113.73    | 1,113.73    |
| INSURANCE EXPENSE        | 9,732.35   | 5,193.85    | 5,193.85    |
| BUSINESS DEVELOPMENT     | 1,859.07   | 2,227.47    | 2,227.47    |
| PROFESSIONAL FEES        | 1,868.17   | 1,225.11    | 1,225.11    |
| MAINTENANCE/REPAIRS      | 1,528.74   | 2,227.47    | 2,227.47    |
| CLEANING EXPENSE         | 3,639.28   | 2,784.33    | 2,784.33    |
| OTHER                    | 40,013.28  | 43,876.43   | 43,876.43   |
| **Total Cash Payments**  | 915,497.01 | 919,935.90  | 919,935.90  |
| **Increase in Cash**     | 69,244.74  | 127,239.10  | 127,239.10  |

# Telatron Marketing Group, Inc.

## INCOME STATEMENTS

|  | 2010 |
|---|---:|
|  | JAN-OCT ACTUAL |
|  | NOV-DEC EST |
| **Income** |  |
| MISC-111 | 76,443.56 |
| B-103 | 6,211,310.97 |
| G-113 | 55,954.45 |
| V-110 | 18,700.00 |
| A-102 | 42,687.12 |
| N-128 | 19,010.98 |
| F-131 | 102,266.13 |
| U-109 | 1,243,868.81 |
| M-104A | 0.00 |
| M-104B | 0.00 |
| GB-114 | 0.00 |
| AL-101 | 0.00 |
| S-107A | 0.00 |
| S-107B | 758,648.43 |
| SF-106A | 15,878.48 |
| SF-106B | 1,030.58 |
| LH-115 | 13,256.82 |
| NF-116A | 115,393.41 |
| NF-116B | 0.00 |
| NF-116C | 2,208.84 |
| PW-117 | 14,607.33 |
| P-118 | 0.00 |
| MD-119 | 24,258.04 |
| MK-120 | 0.00 |
| SFG-121 | 473,876.98 |
| O-122 | 1,032.75 |
| GC-123 | 0.00 |
| SP-124 | 0.00 |
| BM-125 | 0.00 |
| K-126 | 0.00 |
| E-127 | 19,469.23 |
| T-128 | 17,637.30 |
| T-133 | 0.00 |
| EN-129 | 9,766.68 |
| KD-130 | 0.00 |
| **TOTAL Income** | 9,237,306.89 |
| **Gross Profit** | 9,237,306.89 |
| **Operating Expenses** |  |
| OFFICER'S SALARIES | 1,241,097.69 |
| STAFF SALARIES | 5,521,617.81 |
| MEDICAL CARE PAYMENT | 0.00 |
| SUBCONTRACTORS | 0.00 |
| EMPLOYER FICA | 497,081.99 |
| EMPLOYER FUTA | 22,900.89 |
| WORKERS' COMPENSATION INS | 50,388.96 |
| HEALTH INSURANCE | 119,325.31 |
| LIFE AND DISABILITY | 25,492.01 |
| PROPERTY TAXES | 29,100.00 |
| DEPRECIATION | 139,906.76 |
| BUSINESS DEVELOPMENT | 22,217.88 |
| MARKETING EXPENSE | 0.00 |
| PUBLICATIONS/SUBSCRIPTIONS | 25,598.43 |
| DUES/MEMBERSHIPS | 829.95 |
| TRUSTEE FEES | 39,000.00 |
| LEGAL FEES | 8,261.64 |
| CONSULTING FEES | 20,528.00 |

# Telatron Marketing Group, Inc.

INCOME STATEMENTS

|  | 2010 |
|---|---:|
|  | JAN-OCT ACTUAL NOV-DEC EST |
| EQUIPMENT MAINTENANCE | 11,629.83 |
| EQUIPMENT RENTAL | 17,165.74 |
| STATIONERY/FORMS | 493.81 |
| SOFTWARE EXPENSE | 11,125.06 |
| POSTAGE | 60,871.60 |
| COURIER | 7,211.22 |
| FLOWERS/GIFTS | 398.20 |
| TRAVEL | 4,891.96 |
| MEALS - TRAVELER | 187.86 |
| ADVERTISING | 6,509.82 |
| OFFICE/STORAGE RENTAL | 419,319.75 |
| SECURITY SERVICE | 7,966.60 |
| CLEANING SERVICE | 2,029.79 |
| CLEANING SUPPLIES | 42,024.90 |
| AUTO RENTAL/LEASE | 1,993.09 |
| OTHER AUTO EXPENSE | 1,806.43 |
| AUTO MILEAGE/GAS | 3,296.07 |
| AUTO INSURANCE | 7,908.96 |
| MAINTENANCE/REPAIRS | 22,623.04 |
| PA SALES TAX | 0.00 |
| PAYROLL PROCESSING | 16,744.15 |
| INSURANCE EXPENSE | 56,931.82 |
| INTEREST EXPENSE | 38,858.21 |
| BANK SERVICE CHARGES | 17,952.88 |
| OTHER SERVICE CHARGES | 33,304.83 |
| COMPUTER SUPPLIES EXPENSE | 881.31 |
| UNEMPLOYMENT COMPENSATION TAX | 166,622.77 |
| DECORATIONS | 0.00 |
| EMPLOYEE INCENTIVES | 33,618.99 |
| CLOTHING/UNIFORM EXPENSE | 654.59 |
| DONATIONS/CONTRIBUTIONS | 0.00 |
| EQUIPMENT EXPENSE | 16,177.63 |
| EMPLOYEE FOOD/BEVERAGE ACCOUNT | 7,871.36 |
| TRAINING/EDUCATION EXPENSE | 662.00 |
| SUPPLIES EXPENSE | 110,432.29 |
| UTILITIES-WATER & SEWER | 5,339.46 |
| UTILITIES - NATURAL GAS | 18,965.23 |
| UTILITIES - ELECTRIC | 125,959.03 |
| WASTE REMOVAL | 21,547.58 |
| TELEPHONE - AT&T | 56,005.41 |
| TELEPHONE - GTE | 0.00 |
| TELEPHONE - QWEST | 85,291.91 |
| PENALTIES - FEDERAL | 0.00 |
| PENALTIES - STATE | 0.00 |
| INTEREST EXPENSE - STATE | 0.00 |
| TELEPHONE EXPENSE | 122,455.27 |
| TOTAL Operating Expenses | 9,329,077.77 |
| Net Income from Operations | (91,770.88) |
| Earnings before Income Tax | (91,770.88) |
| Net Income (Loss) | (91,770.88) |
| EBITDA Add Ins |  |
| DEPRECIATION | 139,906.76 |
| INTEREST AND PENALTIES | 38,858.21 |
| INTEREST DISCOUNT FEES | 33,304.83 |
| EBITDA | 120,298.92 |

## TELATRON MARKETING GROUP, INC.

|  | 2011 PROJECTED |
|---|---|
| TOTAL Income | 14,367,188.45 |
| Gross Profit | 14,367,188.45 |
| Operating Expenses | |
| WAGES & SALARIES | 9,204,428.00 |
| PAYROLL RELATED | 951,450.80 |
| TELEPHONE | 340,497.90 |
| RENT | 514,548.00 |
| STATIONARY and SUPPLIES | 68,961.60 |
| POSTAGE and COURIER | 30,170.70 |
| ADVERTISING | 14,367.00 |
| DEPRECIATION | 114,000.00 |
| INSURANCE EXPENSE | 67,023.00 |
| BUSINESS DEVELOPMENT | 28,734.00 |
| PROFESSIONAL FEES | 15,803.70 |
| MAINTENANCE/REPAIRS | 28,734.00 |
| CLEANING EXPENSE | 35,917.50 |
| OTHER | 566,090.89 |
| TOTAL Operating Expenses | 11,980,727.09 |
| Net Income from Operations | 2,386,461.36 |
| Earnings before Income Tax | 2,386,461.36 |
| Net Income (Loss) | 2,386,461.36 |
| EBITDA Add Ins | 190,607.40 |
| EBITDA | 2,577,068.76 |