# ASSET PURCHASE AGREEMENT

This Asset Purchase Agreement (the "Agreement") is entered into as of July ___, 2011, by and between **CREDITRON FINANCIAL CORPORATION d/b/a TELATRON MARKETING GROUP, INC.** (the "Seller") and **RDI MARKETING SERVICES, INC.** (the "Purchaser"). Seller and Purchaser shall be referred to herein individually as a "Party" or collectively as the "Parties."

WHEREAS, on July 3, 2008 (the "Petition Date"), Seller filed a voluntary Chapter 11 petition for relief under Chapter 11 of Title 11 of the United States Code (the "Bankruptcy Code") with the United States Bankruptcy Court for the Western District of Pennsylvania, Erie Division, at Case No. 08-11289 (TPA) (the "Bankruptcy Court");

WHEREAS, on December 23, 2010, the Bankruptcy Court ordered the appointment of a Chapter 11 Trustee and John C. Melaragno, Esq., was appointed as Chapter 11 Trustee on December 27, 2010;

WHEREAS, the Seller currently leases from Boardwalk Business Square (the "Lessor") four commercial offices located at the addresses set forth on Exhibit A hereto (the "Leased Premises") pursuant to the respective leases also included in Exhibit A (the "Existing Leases");

WHEREAS, it is a condition to the obligations of the Purchaser to close the transactions contemplated herein that the Lessor and the Purchaser enter into new lease agreements relating to selected Leased Premises (the "New Leases");

WHEREAS, Seller wishes to sell, transfer, convey, assign and deliver to Purchaser, in accordance with Sections 363 and 365 and other applicable provisions of the Bankruptcy Code, all of the Assets (as defined below), together with the Assumed Liabilities (as defined below), of Seller upon the terms and subject to the conditions set forth in this Agreement;

WHEREAS, Purchaser wishes to purchase and take delivery of such Assets and Assumed Liabilities upon such terms and subject to such conditions; and

WHEREAS, Purchaser requires that the Assets be sold pursuant to a Sale Order (as defined below) of the Bankruptcy Court approving the sale under Section 363 of the Bankruptcy Code and authorizing the assumption and assignment of certain executory contracts, unexpired leases and related liabilities, if any, pursuant to Section 365 of the Bankruptcy Code and the terms and conditions of this Agreement.

NOW, THEREFORE, in consideration of the premises and mutual promises herein, and in consideration of the representations, warranties, and covenants herein, the Parties agree as follows:

EXHIBIT "A"

# ARTICLE I
# PURCHASE OF ASSETS

1.1 <u>Assets to be Sold</u>. Upon the terms and subject to the conditions set forth in this Agreement, Seller shall sell, convey, assign, transfer and deliver to Purchaser, free and clear of all encumbrances and Purchaser shall purchase and acquire from Seller, Seller's right, title and interest in and to all Seller's property and assets, tangible and intangible, including the following (but excluding the Excluded Assets (as defined below):

(a) all tangible personal property or Seller, including without limitation, all furniture and equipment;

(b) all personnel records and other records

(c) all rights of Seller in any prepaid expenses, including all deposits paid to Seller's suppliers and utility providers, and claims for refunds and rights to offset in respect thereof;

(d) any executory contracts or unexpired leases (the "Seller Contracts") listed on Schedule 1.1 (d) hereto as approved pursuant to Sections 365 and 1113 of the Bankruptcy Code (the "Assumed Contracts");

(e) all governmental authorizations and all pending applications therefore or renewals thereof, in each case to the extent, if any, they are transferable to Purchaser;

(f) all data and records related to the operations of Seller, including client and customer lists and records, referral sources, research and development reports and records, production reports and records, service and warranty records, equipment logs, operating guides and manuals, financial and accounting records, creative materials, advertising materials, promotional materials, studies, reports, correspondence and other similar documents and records, provided however, that for the greater of (I) three years after the Closing Date (defined below) or (II) two years after the Bankruptcy Court enters an order closing Seller's Bankruptcy Case, Purchaser shall grant Seller or the Covattos (as defined below) access to any information described in this paragraph that Seller or the Covattos deem reasonably necessary in connection with, inter alia, Seller's bankruptcy proceeding, Seller's or Covatto's tax related issues or to purchase Seller's claims, causes or action, choices of action and rights of recovery and Seller or the Covattos shall reimburse Purchaser for any reasonable out-of-pocket expenses incurred by Purchaser in providing such access;

(g) all of the intangible rights and property of Seller, good-will, telephone and telecopy numbers, and email addresses and web sites, to the extent any of the foregoing are transferable;

(h) all intellectual property rights of Seller including, without limitation, all rights in and to the trademarks, service marks, trade names, trade dress, domain names and

other names and brand identifiers held or used by Seller and the applications, registrations and all filings associated therewith;

(i) all of Seller's rights under any insurance policies under which Seller is a beneficiary; and

(j) all of Seller's rights under any non-disclosure, confidentiality, non-compete or non-solicitation agreement with employees, contractors or agents of Seller, or with third parties, that relate to Seller's business or the Assets.

(collectively, all of the items in (a)-(j), the "Assets").

1.2. <u>Excluded Assets</u>. Notwithstanding anything to the contrary contained in Section 1.1 or elsewhere in this Agreement, the following assets of Seller (collectively, the "Excluded Assets") are not part of the sale and purchase contemplated hereunder, are excluded from the Assets, and shall remain the property of Seller after the closing:

(a) all Seller Contracts that are not Assumed Contracts or Purchased Equipment Leases (defined below);

(b) all accounts receivable (the "Accounts Receivable") as of the closing date;

(c) all claims for refund of taxes and other governmental charges of whatever nature (including any interest related thereto);

(d) all rights of Seller under this Agreement;

(e) Seller's corporate seals, stock record books, corporate record books containing minutes of meetings of directors and stockholders; tax returns and records, books of account and ledgers of such other records having to do solely with Seller's organization or stock capitalization or Excluded Assets or Excluded Liabilities (as defined below);

(f) claims against third parties including, but not limited to, Seller's claims, causes of action, choices of action and rights of recovery pursuant to Sections 544 through 550 and Section 553 of the Bankruptcy Code and any other avoidance actions under any other applicable provisions of the Bankruptcy Code; and

(g) cash on hand.

1.3 <u>Consideration.</u> The Purchaser will purchase the Assets to be sold for the following total consideration:

1.3.1 Eight Hundred Thousand Dollars ($800,000.00) cash, wire or certified funds at the time of Closing; and

1.3.2 Within ten (10) business days after December 31, 2011 the sum of Six Hundred Thousand Dollars ($600,000.00) if (a) revenue from Bank of America directly

relating to the Business during the first full month following the Closing Date through December 31, 2011 has averaged the gross amount billed of at least Six Hundred Thousand Dollars ($600,000.00) per month. The Purchaser shall attempt to fulfill all available Bank of America hours and shall, in good faith, attempt to meet or exceed the $600,000.00 monthly gross billing.

1.3.3 Allocation. On the Closing Date, the parties will agree to a Certificate of Allocation setting forth the allocation of the Purchase Price among the Assets which will be binding and conclusive on the parties for all purposes including for reporting to any taxing authority.

1.4 Assumed Liabilities. Incident to the purchase of the Assets and as part of the Purchase Price, Purchaser shall assume and become responsible for and shall thereafter pay, perform and discharge in accordance with their terms, any liability arising on and after the Closing Date under the Assumed Contracts, and the Assumed Cure Amounts (collectively, the "Assumed Liabilities").

1.5 Retained Liabilities. Seller shall remain solely responsible for all liabilities that are not Assumed Liabilities (the "Retained Liabilities").

1.6 Deposit. An earnest money deposit (the "Deposit") In the amount of Two Hundred Thousand Dollars ($200,000.00) has been paid by Purchaser into Sellers's counsel's non-interest bearing IOLTA trust account. The Deposit will be credited against the Purchase Price at Closing. Subject to Section 9.2, the Deposit shall be refunded to Purchaser in the event the transaction does not close, whether as a result or failure to satisfy the conditions to Closing set forth in Article VII, Purchaser not being the Successful Bidder (as defined in the Bid Procedures Order) at the Bankruptcy Sale, or any other reason other than a breach of this Agreement by Purchaser.

1.7 Closing. The Closing of the sale contemplated by this Agreement (the "Closing" or "Closing Date") shall take place at the offices of Purchaser's attorney, in Erie, Pennsylvania, and shall occur consistent with timetables established by the Bankruptcy Court which are reasonably satisfactory to Seller and Purchaser, but in any event not later than fifteen (15) days after the date of the Sale Hearing at which time the sale is approved.

1.8 Collection of Accounts Receivable. On behalf of Seller, Purchaser will use its best efforts to collect the Excluded Receivables for a period of sixty (60) days after Closing and will deposit such collections at the direction of Seller and/or the Bankruptcy Court. Seller shall cooperate with Purchaser in collecting the Excluded Receivables.

ARTICLE II
REPRESENTATIONS AND WARRANTIES OF SELLER

2.1 Seller represents, warrants, and covenant to Purchaser as follows:

(a) Seller owns the Assets and, if Purchaser is the Successful Bidder at the Bankruptcy Sale, will transfer all of the Assets to Purchaser at the Closing, free and clear

of all liens, claims encumbrances, and/or other obligations, consistent with the provisions of the Bankruptcy Code;

(b) Subject to Bankruptcy Court approval, Seller has the corporate power, legal capacity and authority to enter into and perform under this Agreement, and all other agreements to which Seller is or will be a party that are required in order to consummate the transaction contemplated by this Agreement. The execution, delivery and performance of this Agreement has been duly and validly approved and authorized by all necessary corporate action on the part of Seller;

(c) Seller will file the Sale Motion seeking entry of a Sale Order approving the sale and this Agreement and finding that Purchaser has purchased the Assets for reasonably equivalent value, and in good faith pursuant to the terms of Section 363(m) of the Bankruptcy Code;

(d) Except as contained in Section 1.5 herein and Schedule 1.1(d), there are no obligations and/or liabilities of Seller contingent or otherwise being assumed by Purchaser, including without limitation, obligations relating to employees, union contracts, and pension liabilities other than the Assumed Liabilities;

(e) Except as otherwise disclosed, Seller knows of no fact or event which does, or with the passage of time may, have a materially adverse effect on Seller's business or its prospects;

(f) Unless otherwise disclosed, Seller has not been cited for any OSHA, EPA and/or any other governmental violation and to the best of Seller's knowledge, there is no fact or event which, with the passage of time, will give cause to a violation of any of the above;

(g) Except as otherwise disclosed, Seller has not been cited for any unfair labor act nor to the best of Seller's knowledge is there any fact or circumstance which exists that would give rise to an unfair labor act;

(h) There are no actions, suits, proceedings or investigations pending or to the best of Seller's knowledge threatened against Seller which may have a material adverse impact on Seller, the Assets, or Seller's business prospects;

(i) The unaudited financial statements of Seller for the period ending March 31, 2011 fairly reflect the financial condition of Seller's business and the results of operations through those dates;

(j) The Assets to be acquired by Purchaser will include all assets and properties owned by Seller as set forth herein, and collectively with the equipment subject to the Purchased Equipment Leases and the monthly equipment leases which represent all of the equipment necessary for the operation and conduct of Seller's business in a manner consistent with the past practices. The Purchaser understands that, if it wishes to

continue to operate out of the present facility that it must negotiate terms with the current landlord, Boardwalk.

(k) All of the representations and warranties shall be true at Closing.

2.2 These representations and warranties will Survive only until the Closing after which they are void.

## ARTICLE III
## REPRESENTATIONS AND WARRANTIES OF PURCHASER

3.1 Purchaser represents, warrants and covenants to Seller as follows:

(a) Purchaser is duly organized, validly existing and in good standing under the laws of its state of incorporation and is authorized to carry out the transaction contemplated by this Agreement;

(b) Purchaser has the ability and intention to consummate the transaction contemplated by this Agreement;

(c) Purchaser has the corporate power, legal capacity and authority to enter into and perform its obligations under this Agreement, and all agreements to which Purchaser is or will be a party that are required to be executed in order to consummate the transaction contemplated by this Agreement. The execution, delivery and performance of this Agreement has been duly and validly approved and authorized by person(s) so authorized by Purchaser. The execution and delivery of this Agreement and the consummation of the transaction contemplated hereby have been duly authorized by all necessary corporate action on the part of Purchaser and no other approval is required in connection with the consummation of the transaction contemplated hereby.

(d) Except for entry of the Sale Order and any consent required for the Assumed Contracts, no consent, approval, order or authorization of, or registration, declaration or filing with any governmental authority or other person or entity is required to be obtained or made by Purchaser in connection with the execution and delivery of this Agreement or the consummation of the transaction contemplated hereby.

(e). This Agreement is, or when executed by Purchaser and the other parties hereto will be, valid and binding obligations of Purchaser, enforceable against Purchaser in accordance with its terms except as to the effect, if any, of applicable bankruptcy law.

(f) Neither the execution and delivery of this Agreement nor the consummation of the transaction provided for herein, will conflict with or result in a termination, breach, impairment or violation of: (i) any provisions of Purchaser's charter documents, as

currently in effect; or (ii) any order or legal requirement of a governmental authority applicable to Purchaser or any of its assets or properties.

(g) Purchaser will acquire the Assets for the purposes of investment and not with a view to offering the same for sale in connection with any distribution thereof.

3.2 All of the representations of Purchaser shall be true at Closing.

## ARTICLE IV
## SELLER COVENANTS

4.1 <u>Advice of Changes</u>. During the period from the date of this Agreement until the earlier to occur of the Closing Date or the termination of this Agreement in accordance with the provisions of Article IX hereof, Seller will promptly advise Purchaser in writing of: (a) the discovery by Seller of any event, condition, fact or circumstance occurring on or prior to the date of this Agreement that would render any representation or warranty by Seller contained in this Agreement untrue or inaccurate in any material respect; (b) any event, condition, fact or circumstance occurring subsequent to the date of this Agreement that would render any representation or warranty by Seller contained in this Agreement, if made on or as of the Closing Date (provided that representations and warranties which are confined to a specific date shall speak as of that date), untrue or inaccurate in any material respect; (c) any breach of any covenant or obligation of Seller pursuant to this Agreement; and (d) any event, condition, fact or circumstance that is reasonably likely to make the timely satisfaction of any of the conditions set forth in Article VII impossible or unlikely.

4.2 <u>Conduct of Business</u>. Up to and including the Closing Date, Seller and its management team shall conduct operations of Seller only in the ordinary course of business and will not take any of the following actions, except to the extent authorized by the Bankruptcy Court after notice and a hearing which includes notice to Purchaser:

(a) sell, assign, lease or transfer any of its assets, except in the ordinary course of business;

(b) permit any of its shares of stock to be sold redeemed or transferred;

(c) permit any of its Assets or shares of stock to become subject to any lien, security interest or other encumbrances of any kind of nature, to which they are not subject as of the date of this Agreement;

(d) issue additional shares of stock or participate in any merger or plan of share exchange;

(e) enter into, modify or terminate any contract, instrument, license or permit relating to its business, customers, or creditors, except in the ordinary course of business;

(f) hire or terminate any of its employees, except for cause or in the ordinary course of business;

(g.) pay, declare or accrue any bonuses, increases in salaries or compensation for services, except in the ordinary course of business;

(h) incur any indebtedness except in the ordinary course of general business purposes;

(i) except in the normal course of business, lend any funds, extend any credit or grant any discounts to any person or entity;

(j) engage in any transaction with any related or affiliated party, except in the ordinary course of business; or

(k) make any distributions or pay any dividends with respect to the stock of Seller or make any other distributions to the shareholders of any kind except either for salary in the normal course of business or to pay estimated federal and state income taxes on any earnings of Seller.

4.3 Litigation. Seller will notify Purchaser in writing promptly after learning of any proceeding by or before any governmental authority, or other litigation initiated or threatened against Seller relating to the business of Seller or the Assets or for the purpose or with the effect of enjoining or preventing the consummation of the transaction contemplated by this Agreement, or which, if adversely determine, would be reasonably expected to have a material adverse effect on Seller or its business prospects.

4.4 Satisfaction of Closing Conditions. Seller will use its commercially reasonable efforts to satisfy or cause to be satisfied all the conditions precedent which are set forth in Article VII on or before the Closing Date. Subject to the terms and conditions of this Agreement, Seller will use its commercially reasonable efforts to cause the transactions contemplated by this Agreement to be consummated, and, without limiting the generality of the foregoing, to obtain all consents and authorizations of third parties and to make all filing with, and give all notices to, third parties that may be necessary or reasonably required on its part in order to effect the transactions contemplated hereby.

4.5 Regulatory Approvals. Seller shall execute and file, or join in the execution of filing of, any application or other document required to be filed or as specifically requested by Purchaser.

## ARTICLE V
## PURCHASER COVENANTS

5.1 Advice of Changes. During the period from the date of this Agreement until the earlier to occur of the Closing Date or the termination of this Agreement in accordance with the provisions of Article IX hereof, Purchaser will promptly advise Seller in writing of: (a) the discovery by Purchaser of any event, condition, fact or circumstance occurring on or prior to the date of this Agreement that would render any representation or warranty by Purchaser contained

in this Agreement untrue or inaccurate in any material respect; (b) any event, condition or fact or circumstance occurring subsequent to the date of this Agreement that would render any representation or warranty by Purchaser contained in this Agreement, if made on or as of the Closing Date (provided that the representations and warranties which are confined to a specific date shall speak only as of such date), untrue or inaccurate in any material respect; (c) any breach of any convent or obligation of Purchase pursuant to this Agreement; and (d) any event, condition, fact or circumstance that is reasonably likely to make the timely satisfaction of any of the conditions set forth in Article VI impossible or unlikely.

5.2 Regulatory Approvals. Purchaser will execute and file, or join in the execution and filing of, any application or other document that may be necessary in order to obtain any governmental authorization, which may be reasonably required, or which Seller may reasonably request, in connection with the consummation of the transactions provided for in this Agreement. Purchaser will use commercially reasonable efforts to obtain all such governmental authorizations.

5.3 Litigation. Purchaser will notify Seller in writing promptly after learning of any proceeding threatened or pending for the purpose or with the probable effect of enjoining or preventing the consummation of the transaction contemplated by this Agreement, or which would be reasonably expected to have a material adverse effect on the transaction contemplated by this Agreement.

5.4 Satisfaction of Conditions Precedent. Purchaser will use commercially reasonable efforts to satisfy or cause to be satisfied all of the conditions precedent which are set forth in Article VII on or before the Closing Date. Upon the terms and subject to the conditions of this Agreement, Purchaser will use commercially reasonable efforts to cause the transaction contemplated by this Agreement to be consummated, and, without limiting the generality of the foregoing, to obtain all consents and authorizations of third parties and to make all filings with, and give all notices to, third parties that may be necessary or reasonably required on its part in order to effect the transaction provided for herein.

## ARTICLE VI
## CONDITIONS TO OBLIGATIONS OF SELLER

Seller's obligations hereunder are subject to the fulfillment or satisfaction on and as of the Closing Date, each of the following conditions (anyone or more of which may be waived by Seller, but only in writing signed on behalf of Seller by an authorized agent):

6.1 Accuracy of Representations and Warranties. Each of the representations and warranties of Purchaser set forth in Article III of this Agreement shall be true and correct in all material respects on and as of the date hereof and on and as of the Closing Date with the same effect as though such representations and warranties had been made on and as of the Closing Date, except that to the extent such representations and warranties shall, to such extent, be true and correct as of the date hereof and on and as of such particular date as if made on and as of such particular date.

6.2 Covenants. Purchaser shall have performed and complied in all material respects with all of its covenants contained in Article V on or before the Closing Date.

6.3 Compliance with Law. There shall be no order by any governmental authority or any other fact or circumstance, which would prohibit or render illegal the transactions contemplated by this Agreement.

6.4 Absence of Litigation. No proceeding shall be pending which could reasonably be expected to have the effect of enjoining or preventing the consummation, or altering the terms of the transaction provided for in this Agreement.

6.5 Sale Order. The Bankruptcy Court shall have entered the Sale Order (as defined below).

6.6 Other Deliveries. Purchaser shall have delivered to Seller any other documents necessary to consummate the transaction contemplated by this Agreement.

# ARTICLE VII
# CONDITIONS TO OBLIGATIONS OF PURCHASER

The obligations of Purchaser hereunder are subject to the fulfillment or satisfaction on, and as of the Closing Date, of each of the following conditions (anyone or more of which may be waived by Purchaser, but only in a writing signed on behalf of Purchaser by an authorized agent):

7.1 Accuracy of Representations and Warranties. Each of the representations and warranties of Seller set forth in Article II of this Agreement shall be true and correct in all material respects on and as of the date hereof and on and as of the Closing Date with the same effect as though such representations and warranties had been made on and as of the Closing Date, except that to the extent such representations and warranties shall, to such extent, be true and correct as of the date hereof and on and as of such particular date as if made on and as of such particular date.

7.2 Covenants. Seller shall have performed and complied in all material respects with all of its covenants contained in Article IV on or before the Closing Date.

7.3 Compliance with Law. There shall be no order by any governmental authority or any other fact or circumstance, which would prohibit or render illegal the transactions contemplated by this Agreement.

7.4 Absence of Litigation. No proceeding shall be pending which could reasonably be expected to have the effect of enjoining or preventing the consummation, or altering the terms, of any of the transactions provided for in this Agreement.

7.5 Bid Procedures Order and Sale Order. The Bid Procedures Order (in form and substance acceptable to Purchaser) shall have been entered by the Bankruptcy Court. The Sale

Order (in form and substance acceptable to Purchaser) shall have been entered by the Bankruptcy Court.

7.6 Other Deliveries. Seller shall have delivered to Purchaser the following:

(a) a customary bill of sale for all of the Assets, duly executed by Seller; and

(b) such other documents and other instruments of transfer and conveyance as may reasonably be requested by Purchaser, each in form and substance satisfactory to Purchaser and its legal counsel and executed by Seller.

7.7 Due Diligence. This Agreement is contingent upon Purchaser's satisfaction with the results of its due diligence, the satisfaction of such results to be determined in the sole discretion of Purchaser. Purchaser shall complete all due diligence at least ten (10) days prior to the date of the first scheduled sale hearing.

7.8 Financing. This agreement is not contingent upon the Purchaser obtaining financing.

7.9 Leased Premises. This Agreement is contingent upon Lessor and Purchaser entering into the New Leases relating to selected Leased Premises.

## ARTICLE VIII
## BANKRUPTCY PROCEEDING

8.1 Sale Motion and Order. Seller shall file a motion (in form and substance acceptable to Purchaser) simultaneous with the execution of this Agreement (the "Sale Motion"), pursuant to Section 363 of the Bankruptcy Code to obtain Bankruptcy Court approval of the sale and this Agreement (the "Sale Order"). The Sale Order shall be reasonably acceptable to Purchaser. Purchaser understands that the sale is subject to higher bids at the Bankruptcy Court sale confirmation hearing (the "Bankruptcy Sale") in accordance with the pre-approved Bidding Procedures.

8.2 Bidding Procedures Motion and Order. Seller shall file a bidding procedures motion (in form and substance acceptable to Purchaser) simultaneous with the execution of this Agreement (the "Bidding Procedures Motion") seeking the Bankruptcy Court's approval of a process and procedure for competitive bidding at the Bankruptcy Sale, requiring without limitation that third party bidders prequalify in advance of the date of the Bankruptcy Sale hearing and that competing bids be made on the same terms and conditions as the starting bid (except for the increased Purchase Price) (collectively, the "Bidding Procedures"). As a required component of the Bidding Procedures, Seller shall also seek the Bankruptcy Court's approval of Seller's designation of Purchaser as the "stalking-horse bidder" at the Bankruptcy Sale, as follows:

(a) The Initial Upset. The initial bid by a qualified third party bidder must, in addition to any other requirements, be equal to the sum of the items in Section 1.3.1 plus $45,000.00 plus the sum set forth in 1.3.2 plus sum of $30,000.00;

(b) <u>Further Bid Increments</u>. Bids submitted after the initial upset bid must exceed the Purchase Price in increments of at least $50,000.00; and will be allocated 60% to the initial purchase price and 40% to the BoA contingent payment set forth in Paragraph 1.3.2.

(c) <u>Confidentiality Agreements</u>. Seller agrees that potential bidders for the Assets shall be required to execute a Nondisclosure Agreement in the form acceptable to Seller.

## ARTICLE IX
## TERMINATION

9.1 <u>Termination of Agreement</u>. The Parties may terminate this Agreement as provided below:

(a) Purchaser and Seller may terminate this Agreement by mutual written consent at any time prior to Closing;

(b) Purchaser may terminate this Agreement at its option by giving written notice to Seller at any time prior to the Closing if:

(i) Seller has breached any representation, warranty, or covenant contained in Articles II and/or IV of this Agreement in any material respect, Purchaser has notified Seller of the breach, and the breach has continued without cure reasonably satisfactory to Purchaser for a period of ten (10) days after the notice of the breach, or Seller fails to consummate the transactions contemplated by this Agreement, notwithstanding the satisfaction or waiver of all of the conditions set forth in Section VI hereof; or

(ii) Purchaser's conditions to Closing set forth in Article VII are not satisfactorily met in Purchaser's sole discretion; or

(iii) The Closing shall not have occurred on or before August 26, 2011, unless the Parties agree otherwise (unless the failure results primarily from Purchaser itself breaching any representation, warranty, or covenant contained in this Agreement).

(c) Seller may terminate this Agreement by giving written notice to Purchaser at any time prior to Closing if:

(i) Purchaser has breached any representation, warranty, or covenant contained in Articles III and/or V of this Agreement in any material respect, Seller has notified Purchaser of the breach, and the breach has continued without cure reasonably satisfactory to Seller for a period of ten (10) days after the notice of the breach, or Purchaser fails to consummate the transaction contemplated by this

Agreement, notwithstanding the satisfaction or waiver of all of the conditions set forth in section VII hereof; or

   (ii) The Closing shall not have occurred on or before August 26, 2011, unless the Parties agree otherwise (unless the failure results primarily from Seller breaching any representation, warranty, or covenant contained in this Agreement).

 9.2 <u>Deposit</u>. In the event of termination of this Agreement by Purchaser under Section 9.1 above, the Deposit will be returned to Purchaser by Seller within five (5) business days of the receipt of written notice in the case of Section 9.1 (b) or (c), or the date that the mutual agreement is reached by the parties in the case of Section 9.1 (a). In the event that Purchaser is not the successful bidder as set forth in Section 8.2 above, the refund of the Deposit will be directed by the Bankruptcy Court.

## ARTICLE X
## TAXES

 10.1 <u>Tax Refunds</u>. Any tax refunds (including any interest related thereto) received by Purchaser with respect to the Assets or Seller's business relating to taxes paid for the pre-Closing tax period that Seller has paid shall be for the account of Seller, and Purchaser shall pay over any such amount within five (5) business days of receipt thereof. Purchaser shall include with its remittance to Seller copies of any correspondence, documents or other materials received or transmitted to Purchaser with respect to any tax refund.

 10.2 <u>Cooperation on Tax Matters</u>. Seller and Purchaser shall cooperate fully with each other and make available or cause to be made available to each other for consultation, inspection and copying (at such other Party's expense) in a timely fashion such personnel, tax data, relevant tax returns or portions thereof and filings, files, books, records, documents, financial, technical and operating data, computer records and other information as may be reasonably required (i) for the preparation by such other Party of any tax returns or (ii) in connection with any tax audit or proceeding including one Party to the extent such tax audit or proceeding relates to or arises from the transactions contemplated by this Agreement or Seller's business activities prior to the Closing Date.

## ARTICLE XI
## MISCELLANEOUS

 11.1 <u>Entire Agreement</u>. This Agreement, the Schedules and Exhibits hereto constitute the entire understanding and agreement of the Parties hereto with respect to the subject matter hereof and supersede all prior and contemporaneous agreements or understandings, inducements or conditions, express or implied, written or oral, between the Parties with respect to the subject matter hereof. The express terms hereof control and supersede any course of performance or usage of trade inconsistent with any of the terms hereof.

 11.2 <u>Assignment; Binding Upon Successors and Assigns.</u> Neither Party hereto may assign any of its rights or obligations hereunder without the prior written consent of the other

Party hereto. This Agreement will be binding upon and inure to the benefit of the Parties hereto and their respective successors and permitted assigns.

11.3 No Third Party Beneficiaries. No provisions of this Agreement are intended nor will be interpreted, to provide or create any third party beneficiary rights or any other rights of any kind in any client, customer, affiliate, stockholder, partner, employee of any Party hereto or any other person or entity unless specifically provided otherwise herein, and, except as so provided, all provisions hereof will be personal solely between the Parties to this Agreement.

11.4 Severability. If any provision of this Agreement, or the application thereof, is for any reason held to any extent to be invalid or unenforceable, the remainder of this Agreement and application of such provision to other persons or circumstances will be interpreted so as reasonably to effect the intent of the Parties hereto. The Parties further agree to replace such unenforceable provision of this Agreement with a valid and enforceable provision that will achieve, to the extent possible, the economic, business and other purposes of the void or unenforceable provision.

11.5 Section Headings. A reference to an Article, Section, Schedule or Exhibit will mean an Article or Section in, or a Schedule or Exhibit to, this Agreement, unless otherwise explicitly set forth. The titles and headings in this Agreement are for reference purposes only and will not in any manner limit the construction of this Agreement. For the purposes of such construction, this Agreement will be considered as a whole.

11.6 Amendment, Extension and Waivers. At any time prior to the Closing Date, Purchaser and Seller may, to the extent legally allowed: (a) extend the time for performance of any of the obligations of the obligations of the other Party; (b) waive any inaccuracies in the representations and warranties made to such Party contained herein or in any document delivered pursuant hereto; and (c) waive compliance with any of the agreements, covenants or conditions for the benefit of such Party contained herein. Any term or provision of this Agreement may be amended at any time. Any agreement to any amendment, extension or waiver will be valid only if set forth in writing and signed by all Parties. The waiver by a Party of any breach hereof or default in the performance hereof will not be deemed to constitute a waiver of any other default or any succeeding breach or default. The failure of any party to enforce any of the provisions hereof will not be construed to be a waiver of the right of such party thereafter to enforce such provisions.

11.7 Confidentiality. Purchaser acknowledges that it has and will receive certain confidential information with respect to the operations of Seller. Purchaser, along with its agents and representatives, shall adhere to the following:

    a. Nonsolicitation and Nonacceptance. If Purchaser is not awarded the Assets by the Bankruptcy Court, Purchaser agrees not to, either directly or indirectly, solicit or accept (if contacted), for a period of two (2) years following the date of this Agreement any of the Customer accounts presently serviced by the Seller. In the event Purchaser is contacted by such Customers, it will inform such customers that it cannot contract with such Customers for said accounts.

b. <u>Nondisclosure</u>. Purchaser acknowledges that it may come into possession of certain confidential, proprietary and trade secret information, materials and business concepts with respect to the operation of Seller's business, including information regarding sales and marketing, products, services, vendors, customer lists and files (including former customers), accounting data and methods, operating procedures, pricing policies, strategic plans, intellectual property, customer contracts and other agreements, and manufacturer's warranties (collectively, the "Proprietary Information"). Purchaser agrees for a period of two (2) years following the date of this Agreement: (i) not to publish, copy, disclose, allow to be disclosed, or use for its own benefit or for the benefit of any other person, firm, corporation or entity, the Proprietary Information without the prior written consent of Seller, which can be withheld in its sole discretion, and (ii) to maintain strictly the confidentiality of the Proprietary Information at all times. Purchaser agrees to take all necessary precautions to protect the Proprietary Information from unauthorized disclosure or use. This Agreement shall be inoperative as to such portions of the Proprietary Information which (i) are or become generally available to the public other than as a result of an unauthorized disclosure by Purchaser or its representatives; (ii) become available to Purchaser on a non-confidential basis from another source, or (iii) were known to Purchaser on a non-confidential basis prior to its disclosure to Purchaser by the Seller or one of its representatives; or (iv) Purchaser is required to disclose by law, regulation, or the order of any court or governmental authority of competent jurisdiction.

c. <u>Employees</u>. If Purchaser is not awarded the Assets by the Bankruptcy Court, for a period of two (2) years from this date, Purchaser will not, directly or indirectly, individually or through any other entity or otherwise, without the prior written consent of Seller, which can be withheld in Seller's sole discretion, solicit for hire, attempt to hire or retain any of Seller's employees.

d. <u>Representations</u>. Purchaser represents and warrants that: (a) it has the authority to enter into this Agreement, and that in doing so it will not violate any agreement, order or law and (b) there are no third-party consents required for it to enter into this Agreement which have not been obtained and delivered to Seller.

11.8 <u>Governing Law</u>. The validity of the Agreement, the construction of its terms, and the interpretation and enforcement of the rights and duties of the Parties to this Agreement will be exclusively governed by and construed in accordance with the internal laws of the Commonwealth of Pennsylvania without reference to that body of law relating to conflicts of law or choice of law.

11.9 <u>Jurisdiction; Venue; Waiver of Jury Trial.</u>

(a) Each Party to this Agreement hereby agrees that the Bankruptcy Court shall have exclusive jurisdiction to hear and determine any claims or disputes between the Parties pertaining directly or indirectly to this Agreement or to any matter arising herefrom. To the extent permitted by law, each Party hereby expressly submits and consents in advance to such jurisdiction in any action or proceeding commenced by the other Party, and agrees that service of such summons and complaint or other process or papers may be made by registered or certified

mail addressed to such Party at the address to which notices are to be sent pursuant to this Agreement. Each of the Parties waives any claim that the Bankruptcy Court is an inconvenient forum or an improper forum based on lack of venue. The choice of forum set forth in this Section shall not be deemed to preclude the enforcement of any judgment obtained in such forum or the taking of any action to enforce the same in any other appropriate jurisdiction.

(b) Each Party hereto waives, to the fullest extent permitted by applicable law, any right it may have to a trial by jury with respect to any litigation directly or indirectly arising out of, under or in connection with this Agreement. Each Party hereto (i) certifies that no representative, agent or attorney of the other Party has represented, expressly or otherwise, that the other Party would not, in the event of litigation, seek to enforce the foregoing waiver and (ii) acknowledges that it and the other Party hereto have been induced to enter into this Agreement by, among other things, the mutual waivers and certifications in this Section.

11.10 Notices. Any notice or other communication required or permitted to be given under this Agreement will be in writing or electronic written format, will be delivered personally or by mail or express delivery, postage prepaid, or by electronic mail or by facsimile transmission, and will be deemed given upon actual delivery, or upon transmission if sent via electronic mail or facsimile transmission, or, if mailed by registered or certified mail, on the third business day following deposit in the mail, addressed as follows:

If to Purchaser, to:

RDI Marketing Services, Inc.
4350 Glendale-Milford Road, Suite 250
Cincinnati, OH 45242

If to Seller, to:

John C. Melaragno, Esq.
502 West Seventh Street
Erie, PA 16502

11.11 Time is of the Essence. The Parties hereto acknowledge and agree that time is of the essence in connection with the execution, delivery and performance of this Agreement.

11.12 Due Diligence Inspection. Seller shall permit Purchaser and its agents, legal counsel, accountants, and other representatives to: (a) have reasonable access during normal business hours to all properties, inventory and equipment of Seller; (b) inspect and make copies of any and all documents and records of Seller including without limitation all journals, ledgers, stock records, personnel records, contracts, leases, licenses and all other records, regardless of kind or character, as Purchaser shall from time to time reasonably request; (c) review the books and records of Seller; and (d) conduct such other due diligence as Purchaser or its counsel may

reasonably deem advisable. Purchaser acknowledges that any such inspection is subject to the Confidentiality Provision set forth in 11.7 of this Agreement.

11.13 <u>Counterparts.</u> This Agreement may be executed in counterparts, each of which will be an original as regards any Party whose name appears thereon and all of which together will constitute one and the same instrument, and may be delivered electronically. This Agreement will become binding when one or more counterparts hereof, individually or taken together, bear the signatures of all Parties reflected hereon as signatories.

IN WITNESS WHEREOF, the Parties hereto have executed this Asset Purchase Agreement as of the date first set forth above.

**SELLER**
CREDITRON FINANCIAL CORPORATION
d/b/a TELATRON MARKETING GROUP, INC.

By: _____
Name: John C. Melaragno
Title: Chapter 11 Trustee

**PURCHASER**

RDI MARKETING SERVICES, INC.

By: _____
Name: Bronson Trebbi
Title: CEO

SCHEDULE 1.1 (d)
Assumed Leases and Executory Contracts

| Assumed leases | Cure Amount |
|---|---|
| Columbus Depot Equipment Company<br>P.O. Box 2785<br>Columbus, GA 31902<br><br>Lease for two (2) Routers | $0.00 |
| Pitney Bowes<br>2225 American Drive<br>Neenah, WI 54956<br><br>Lease for Postage Machine & Meter | $0.00 |
| Schwab<br><br>Copier maintenance agreement | $0.00 |

| Assumed Executory Contracts | Cure Amount |
|---|---|
| TeleSales Services, LLC<br>16 Whisperwood Drive<br>Victor, NY 14564 | $0.00 |
| Bank of America<br>210 East Trade Street<br>7th Floor<br>Charlotte, NC 28255 | $0.00 |
| Red Tettemer & Partners<br>1 South Broad Street, 24th Floor<br>Philadelphia, PA 19107 | $0.00 |
| GE Money<br>950 Forrer Boulevard OH3-4233<br>Kettering, OH 45420 | $0.00 |
| State Farm Bank<br>Three State Farm Plaza<br>Bloomington, IL 61791 | $0.00 |
| National Fuel Gas Distribution Corp.<br>1100 State Street<br>Erie, PA 16501 | $0.00 |
| Maverick Network Solutions<br>3411 Silverside Road<br>Hagley Building, Suite 200<br>Wilmington, DE 19810 | $0.00 |

| | |
|---|---|
| Mobile Warranty Corporation<br>22 Equinox Lane<br>Feeehold, NJ | $0.00 |
| Optima Direct<br>8100 Boone Blvd. Suite 300<br>Vienna, VA 22182 | $0.00 |
| Score Marketing<br>450 SW 12th Avenue<br>Deerfield Beach, FL 33422 | $0.00 |
| Ternian Insurance Group, LLC<br>7310 N. 16th Street, Suite 228<br>Phoenix, AZ 85020 | $0.00 |

ET/RPF